# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Cosmano*, 2011 IL App (1st) 101196

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL COSMANO, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-10-1196 |
| Filed | December 27, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for a 1981 murder was upheld over his contentions that several comments in the State's closing argument were improper, that improper evidence concerning the weapon he possessed at the time of his arrest was elicited, that the State violated discovery rules and used false testimony, and that the trial court erred in refusing to dismiss a juror on defendant's request. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-11919; the Hon. Vincent Gaughan, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Edward M. Genson, of Genson & Gillespie, and Marc W. Martin, of
Marc Martin, Ltd., both of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan Spellberg and Janet
C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE KARNEZIS delivered the judgment of the court, with opinion.
Justices Hall and Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant Michael Cosmano was convicted of the 1981 murder
of Milton Rodriguez. On appeal, defendant argues: (1) the State made numerous improper
comments during closing argument, the cumulative effect of which warrants a new trial; (2)
the State elicited improper evidence regarding a gun defendant possessed at the time of his
arrest; (3) the State used false testimony and violated discovery rules; and (4) the trial court
erred when it denied defendant's request to dismiss a juror. For the following reasons, we
affirm the judgment of the trial court.

¶ 2                                    BACKGROUND

¶ 3     On June 12, 1981, Milton Rodriguez, a delivery driver for Bella's Pizza, was shot in the
alley behind Bella's Pizza. The murder went unsolved. The case was reopened by "cold case"
investigators 26 years later. The investigators reinterviewed the same persons who had been
interviewed at the time of the shooting in 1981. This time, defendant, the owner of Bella's
Pizza, was implicated. He was indicted for first degree murder and was subsequently
convicted.

¶ 4     At trial, Ivan Kevo testified that on June 12, 1981, he lived across the alley from Bella's
Pizza. As he was setting the table for dinner, he heard a shot. He looked out the window and
saw a man lying in the alley. Kevo saw about 10 people running in different directions. He
assumed that the people were Bella's Pizza delivery drivers. Kevo called 911.

¶ 5     Frank Mildenberger testified that on June 12, 1981, he and his girlfriend Helen
Berthorolmey ate at Bella's Pizza. After they ate, they got their bicycles and walked to the
alley to go toward his mother's house. While they were walking their bikes through the alley,
Mildenberger saw two men; one was sitting on the wall and the other was standing in front
of him. Mildenberger and Berthorolmey walked past the men, but when they got a short
distance past, Mildenberger turned around and looked back at the men. Mildenberger saw
the man who was standing pull out a gun and shoot the man sitting on the wall. Mildenberger
told Berthorolmey what he saw. Mildenberger did not see where the man with the gun went

-2-

after he fired the shot.

¶ 6	Mildenberger talked to the police later that day. He described the man who shot the gun as being between 5 feet 7 inches and 5 feet 9 inches, with black hair, wearing dress slacks, a "whitish tanish" shirt and black shoes. Mildenberger did not recall if he told police that he saw the shooter get into a car after the shooting. Mildenberger viewed a lineup on June 22, 1981. He was shown a photograph of the lineup in court and was asked if the photograph accurately depicted the lineup he viewed on June 22, 1981. Mildenberger responded yes. He was then asked if he picked out anyone in the lineup. Mildenberger used the photograph to point out the person he selected as the shooter in the lineup. Mildenberger added that when he selected the "shooter" in the lineup, he was told that the person he selected was a Chicago police officer.

¶ 7	Mildenberger testified that on June 22, 1981, he told police officers that he thought the shooter was the owner of Bella's Pizza. Mildenberger testified that he had never been introduced to the owner of Bella's Pizza and did not know the owner's name. Mildenberger assumed "he was the owner of the pizza place because the way he was dressed and the car that I had seen him supposebly [*sic*] if he was the shooter or not that it was parked there in the alley right where the deceased had gotten shot at."

¶ 8	In August 2007, Chicago police detectives interviewed Mildenberger about the June 21, 1981, shooting. During that interview, Mildenberger reiterated that he believed the shooter was the owner of Bella's Pizza.

¶ 9	In September 2008, a private investigator named Jack Byrne spoke with Mildenberger. Mildenberger gave the same description of the shooter to Investigator Byrne as he had given to the police in 1981. Mildenberger could not remember if he told the police in 2007 or the investigator in 2008 that the shooter had slick, combed-back black hair. Mildenberger could not recall whether he had told the investigator that the shooter was the owner of Bella's Pizza, because he was nervous that day. Mildenberger told Investigator Byrne he did not think the shooter and the owner of Bella's pizza were the same person. Mildenberger spoke with the investigator about the gun he had observed. Mildenberger told the investigator that he owned a BB gun that looked similar to the gun he observed the shooter use. The investigator was shown the gun. The State then showed Mildenberger a photograph of a "similar gun."

¶ 10	Detective Griffin testified that he was assigned to investigate the shooting death of Milton Rodriguez in the alley behind Bella's Pizza. He viewed the scene of the crime and interviewed the police officers who were on the scene when he arrived. Based on his conversation with the officers, Detective Griffin learned that they were looking for a possible Hispanic offender and a 1972 to 1974 blue Chevrolet Nova. He also learned that Frank Mildenberger and Helen Berthorolmey had been in the alley at the time of the shooting and had heard part of a conversation between the shooter and the victim.

¶ 11	Detective Griffin interviewed Frank Mildenberger and Helen Berthorolmey at the scene and at the police station. They described the shooter as male, Hispanic, with a medium complexion, about 40 years old, 5 feet, 9 inches, 195 pounds with black, straight hair, combed back. The offender was wearing a light blue, short-sleeved shirt with jeans and black

shoes and was driving a light blue four-door Chevrolet Nova.

¶ 12      After interviewing several other people, including Wilson Maldonado, Juan Torres, Ivan Kevo, Herman Rivera, Enrique Maldonado, James Bufka and John Chavez, Detective Griffin noted that he needed to speak with a man named Vega who was with Milton Rodriguez when Milton was shot. Detective Griffin learned that Enrique Maldonado had a blue two-door Chevy Nova. After learning this, Detective Griffin was no longer interested in finding the Nova.

¶ 13      Detective Griffin was called to the station when Vega arrived. When he got to the station, Clemente Valencia was there. Valencia was a manager at Bella's Pizza. After having a conversation with Valencia, Detective Griffin began looking for defendant so that he could question him about the murder. Arrangements were made with defendant's attorney, Anthony Onesto, for defendant to participate in a lineup.

¶ 14      Five people participated in the lineup including defendant, defendant's brother, another Bella's employee, a police detective and an unknown person. Both Mildenberger and Berthorolmey viewed the lineup and neither identified defendant as the shooter. Both said that the shooter's hair was straighter and darker than defendant's hair.

¶ 15      The shooting death of Milton Rodriguez went unsolved and became a "cold case." In August 2007, 26 years after the shooting, Guillermo "Willie" Navas, also known as Clemente Valencia, came forward and spoke with Detective Robert Rodriguez. Willie told Detective Rodriguez where he could find Wilson Maldonado and Enrique Maldonado. Detective Rodriguez and other detectives located and interviewed Wilson Maldonado, Enrique Maldonado, James Bufka, Frank Mildenberger, Helen Berthorolmey, Juan Torres, Herman Rivera and Ron Kepco.

¶ 16      Defendant was arrested on May 5, 2008, near his home. After the story of defendant's arrest ran in the newspaper, Detective Rodriguez received a call from Carmen Murillo, who had not been listed as a witness in any of the police reports from 1981. After speaking with Murillo, Detective Rodriguez met with Murillo's sister, Florence Balsitis. Balsitis had not been listed in any reports either.

¶ 17      Yolanda Tribett testified that she worked in the gun registration department of the Chicago police department. A search revealed that defendant registered a .45 Colt Commander with a 4.5-inch barrel on May 3, 1976.

¶ 18      William Demuth testified that he worked in the Illinois State Police and was an expert in the field of firearms and firearm identification. In September, 2007, he received a single fired cartridge case recovered in 1981. He examined it and determined that it was a .45-caliber automatic cartridge case that was consistent with being fired from a Colt Commander but could have been fired from millions of weapons.

¶ 19      Hemenegilo "Herman" Rivera testified that he worked at Bella's Pizza on June 12, 1981, as a delivery driver. Rivera identified defendant as the owner of Bella's Pizza but called him "Mike Romano."

¶ 20      At about 4:30 p.m. on June 12, 1981, Rivera heard several other drivers in the alley having a conversation with "Mike" and Willie, a manager, about a $0.25 raise. Defendant refused to give the $0.25 raise and he and Willie went back inside Bella's Pizza. Later,

defendant and Willie came back outside and went to speak to Milton Rodriguez, who was sitting on a short wall drinking beer. Rivera could not hear what was being said. Rivera heard a shot. He "thought" defendant had a gun and fired the shot. Rodriguez fell to the ground. Defendant and Willie went back inside. Rivera also went back inside to get some pizzas and saw defendant.

¶ 21    Rivera testified that when the police arrived at the scene, they did not speak with him. The police reports from 1981 show, however, that police did speak with Rivera and that Rivera told police that Rodriguez had been with Vega. Rivera testified that he did not say anything to anyone about the shooting because he was told by other Bella's drivers not to. He did not talk to the police because he was afraid of defendant and he feared defendant was in the Mafia, although he did not know for sure if defendant was involved in organized crime. The police came to Rivera's house in January 2008, asking what, if anything, Rivera knew about the shooting. Rivera told police that defendant was having a conversation with Rodriguez and then a shot was fired.

¶ 22    Wilson Maldonado and his brother Enrique worked as pizza delivery persons for Bella's Pizza in June of 1981. On June 12, 1981, defendant and manager Willie were speaking with some of the drivers in the alley about a raise. Defendant indicated that he would not give the drivers a raise until business was better. Milton Rodriguez told defendant that he did not have the brains to increase business. Defendant then walked back inside.

¶ 23    About 10 to 15 minutes later, defendant approached Rodriguez, who was sitting on a low wall in the alley. Other drivers were present in the alley. Wilson heard a shot and saw Rodriguez fall. Wilson ran to Rodriguez and held him until police arrived. Wilson did not see defendant until a few minutes later when defendant walked to his car.

¶ 24    Wilson was interviewed by police following the shooting. He testified that he told the police what had happened. Several days later, a few men came into Bella's and spoke with Wilson about the shooting. They indicated to Wilson that they worked for defendant and asked Wilson some questions about the shooting.

¶ 25    Wilson testified that he had not seen Vega since the shooting but possibly saw him one or two weeks after the shooting. Wilson continued to work at Bella's for nine or 10 years after the shooting. Wilson had been arrested over 30 times between 1981 and his 2010 testimony in court.

¶ 26    Enrique Maldonado had also been arrested over 30 times between 1981 and 2010 and had been convicted of both state and federal drug-related felonies. On June 12, 1981, Enrique was employed as a Bella's delivery driver and drove a blue Chevrolet Nova. Enrique was present for the conversation with defendant and managers Jim and Willie about the raise. Enrique later saw defendant standing in front of Milton Rodriguez, who was sitting on a half-wall in the alley. Enrique heard Rodriguez say that someone should call the police because "they were going to kill him." As he was placing pizzas in his car, he heard a shot and saw Rodriguez fall from the wall. Defendant walked back toward Bella's and the others walked in different directions. Enrique drove away when police arrived because he did not want to get involved because he was on federal parole for a drug charge.

¶ 27    After the shooting, he went to a halfway house where he had to report because he was on

parole. Although he saw his parole officer, he did not inform the parole officer that he had just witnessed a shooting. He returned to Bella's later that night and learned that police were looking for him. Enrique stated that he did not tell the police that he was present when Rodriguez was shot, but told police that he was making deliveries at that time. Enrique denied telling police that he was with Juan Torres, Herman Rivera and his brother Wilson, and did not tell them that he had left the area before the shooting. Enrique worked at Bella's for another eight years. He never told anyone that he witnessed the shooting until investigators questioned him in 2008.

¶ 28    Juan Torres was also a delivery driver at Bella's and was present on June 12, 1981, for the discussion between defendant, the managers and the drivers about the raise. Torres testified that Rodriguez told defendant that he needed a brain to make more money. Defendant confronted Rodriguez about the comment and then walked back inside Bella's.

¶ 29    About 20 minutes later defendant, Willie and Jim Bufka came out and walked toward Rodriguez, who was sitting on a wall in the alley drinking a beer. Defendant walked up to Rodriguez, pulled an item that looked like a gun from his back, and shot in the air. Rodriguez fell off of the wall. Torres did not see where defendant went.

¶ 30    Torres was taken to the police station later that night but did not recall telling police what he had seen. He also denied saying he was inside Bella's with Wilson Maldonado and Herman Rivera when Rodriguez was shot. Torres explained that "everyone" was afraid of defendant because "[p]robably they think it was a mafia guy." About a month after the shooting, some men came to Bella's to talk to him about the shooting. He could not remember what they said but he signed a paper at the end of the conversation. Nevertheless, Torres continued to work at Bella's for nine years after the shooting.

¶ 31    In January 2008, he was contacted by detectives about the shooting. He initially did not want to speak and said that he had "heard" Rodriguez was shot behind Bella's. He later told the detectives that he was present when Rodriguez was shot.

¶ 32    James Bufka testified that on the day of the shooting he was working as the night manager at Bella's Pizza. When he arrived for work, he and defendant learned that Milton Rodriguez had punched a cook. Defendant and Bufka walked outside into the alley and approached Rodriguez, who was sitting on a low wall, drinking a beer. As defendant approached Rodriguez, Rodriguez called defendant a "big shot" and "mister tough guy." Defendant responded that "yeah, I'm a tough guy." Defendant had a gun and Rodriguez did not. Defendant raised the gun and shot Rodriguez, who fell to the ground. Defendant then stated, "self-defense" and walked back into Bella's. The police never spoke with Bufka after the shooting.

¶ 33    Later that evening, two men arrived at Bella's and escorted Bufka to a lawyer's office, where he was introduced to the lawyer and other men who were allegedly ex-federal law enforcement. The men told Bufka what could happen to him if he was picked up for questioning. The lawyer gave Bufka business cards.

¶ 34    Bufka did not make any effort to contact the police after the shooting or after speaking to the lawyer and the men. He did not discuss the shooting until 2008, when he was approached by Detective Rodriguez. Bufka explained that he did not want to get involved

because he was concerned for his safety as he had heard rumors that defendant was involved in the mob. Bufka continued to work at Bella's for some time until he quit because of "something about food."

¶ 35    Carmen Murillo testified that in June 1981, his father worked as a delivery driver for Bella's Pizza. Carmen, who was 15 at the time, worked in the kitchen and his sister Florence helped their father deliver pizzas. Carmen was present when defendant and Willie argued with the drivers about money and working conditions. Shortly after defendant reentered the restaurant, defendant, along with Willie and Jim Bufka, left through the back door into the alley. Defendant had a gun in his hand. Carmen heard a gunshot. Defendant returned to the restaurant with a gun in his hand and gave the gun to Jack, the off-duty police officer who worked security for Bella's. Jack escorted defendant out of Bella's. Carmen did not talk to the police the day of the shooting.

¶ 36    The next day, a private investigator came to Bella's and questioned Carmen about what he knew. Carmen did not tell the investigator what he knew because his father had told him and his sister not to talk to anyone about it. Carmen stated that he was afraid because he had heard that defendant had friends in the Mafia. Carmen spoke with Detective Rodriguez in May 2008 and told Detective Rodriguez what he remembered.

¶ 37    Florence Balsitis was 13 in June, 1981. She helped her father deliver pizzas for Bella's. On June 12, 1981, she was in Milton Rodriguez's car in the alley behind Bella's, petting his dog, and saw defendant and Rodriguez in a heated discussion. Willie and Jim were also present. Balsitis saw defendant shoot Rodriguez and return to Bella's with the gun in his hand. Florence's father grabbed her and told her, "You didn't see a thing. You don't say a thing. You just come with me. Never talk about this again," and then drove her home.

¶ 38    Balsitis identified defendant in a photo of the lineup done in 1981. She testified that defendant appeared different in the photo than he did on the day of the shooting. Balsitis testified that defendant wore his hair slicked back, but in the photo, his hair was curly.

¶ 39    Balsitis did not talk to the police in June 1981. She first spoke to police in 2008, but did not identify defendant. She was afraid for herself and her family because she had heard rumors that defendant was related to organized crime. In December 2009, Balsitis met with an assistant State's Attorney. She testified the first time she ever told anyone that defendant had changed his hair was during that meeting. The parties stipulated that the first time Balsitis mentioned anything about defendant's hair appearing different in the photo lineup from 1981 was on January 10, 2010, the Sunday before the trial began.

¶ 40    The parties stipulated that the Chicago police department did a background check of defendant in an effort to determine whether or not defendant was associated with organized crime. The background check did not reveal any evidence that defendant was connected with organized crime or the Mafia at any time.

¶ 41    Detective Griffin testified for the defense. Detective Griffin testified that his reports from 1981 indicated that he interviewed Frank Mildenberger, Ivan Kevo, Wilson Maldonado, Herman Rivera, Enrique Maldonado, Juan Torres, James Bufka and John Chavez. The summary of the interview with Rivera indicated that Rivera told police he was at Bella's, corroborated what Torres told the police and substantiated where Torres and Wilson

Maldonado were at the time of the shooting. The summary of what Juan Torres told police was that he was with Wilson Maldonado and Herman Rivera during the shooting. They were directly behind Bella's and out of eyesight of Rodriguez. The summary also indicated that Torres told police that he left the victim about five minutes before the shooting and the victim was talking to someone named Vega. The summary of the interview with Enrique Maldonado stated that Maldonado told police that he was with Torres, Rivera and his brother Wilson and left before any shot was fired. The police also interviewed Wilson Maldonado. The summary of the interview with Wilson does not indicate that Wilson witnessed the shooting. There were two witnesses who said that Wilson Maldonado and Juan Torres were involved in the shooting. The reports indicate that the witnesses stated they would cooperate in the investigation and could identify the offender. The police obtained the witnesses' identifying information.

¶ 42 Detective Rodriguez was also called by the defense. Detective Rodriguez interviewed Enrique Maldonado on February 29, 2008. During that interview, Enrique did not state that he had gone to meet with his parole officer on the day of the shooting.

¶ 43 Detective Rodriguez interviewed Carmen Murillo in May 2008. Detective Rodriguez's report does not include that Murillo told Detective Rodriguez that after he shot the victim, defendant handed the gun to Jack, the off-duty Chicago police officer. In addition, Carmen told Detective Rodriguez that after the shooting, his father made him and his sister get in the car and leave. Balsitis corroborated this in her interview.

¶ 44 The parties stipulated that Assistant State's Attorney Matthew Thrun would testify that he interviewed Enrique Maldonado on March 4, 2008, prior to his appearance before the grand jury. Enrique never stated that he met with a federal parole officer on June 12, 1981, after the shooting.

¶ 45 Cook County State's Attorney's Office Investigator John Duffy testified that he interviewed John "Jack" Howell. Howell stood in the initial lineup in 1981. Investigator Duffy spoke with Frank Mildenberger in July 2009. Before that however, Mildenberger received a copy of a report prepared by private investigator John Byrne regarding Mildenberger's interview with Investigator Byrne. That report contained Mildenberger's description of the shooter: skinny with combed-back hair. Investigator Byrne's report indicated that he asked Mildenberger whether or not he thought the shooter was the owner of Bella's pizza and that Mildenberger replied that he did not. Investigator Duffy testified that Mildenberger told him that even though he was 15 years old at the time of the shooting, he would still recognize the shooter if he saw him.

¶ 46 Investigator Duffy also testified that Mildenberger had told the original detectives that he believed the shooter was the owner of Bella's Pizza based on the way he was dressed and his car. Mildenberger did not identify defendant in the lineup in 1981.

¶ 47 The parties stipulated that Assistant State's Attorney Tina Morris would testify that when she presented Carmen Murillo to the grand jury, Murillo testified that defendant held the gun by his side with his left hand, stopped by the door and placed the revolver in the back of his pants.

¶ 48 After hearing all of the evidence, the jury found defendant guilty of murder. Defendant

was sentenced to 29 years' imprisonment. It is from this judgment that defendant now appeals.

¶ 49                                            ANALYSIS

¶ 50                                      A. Closing Argument

¶ 51    Defendant argues that the State made numerous improper comments during closing argument. First, defendant claims that the State "exploited" Mafia evidence by making arguments not based on evidence in the record during closing argument. Second, defendant argues that the State erroneously commented on defendant's failure to produce evidence. Third, defendant argues that the State improperly argued that defendant must have been guilty because he obtained an attorney thereby violating his sixth amendment right. Finally, defendant claims that the State argued "rank hearsay" as substantive evidence during closing argument. Defendant urges that the cumulative effect of these errors merits a new trial.

¶ 52    At the forefront, it is important to note that the parties disagree on the standard of review for issues relating to closing argument. We recognize that our appellate courts are divided on the standard of review for closing remarks. *People v. Maldonado*, 402 Ill. App. 3d 411, 421 (2010). The confusion stems from two supreme court cases. In *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), the supreme court held that whether a prosecutor's remarks are so egregious as to require a new trial presents a question of law that is reviewed *de novo*. However, the *Wheeler* court also cited with approval *People v. Blue*, 189 Ill. 2d 99 (2000), wherein the court applied the abuse of discretion standard to review a prosecutor's remarks during closing argument. *Wheeler*, 226 Ill. 2d at 121.

¶ 53    This division of this district has noted the conflict but has declined to determine the appropriate standard of review where the result would be the same regardless of the standard applied. See *Maldonado*, 402 Ill. App. 3d at 422; *People v. Anderson*, 407 Ill. App. 3d 662, 676 (2011). Because we would reach the same result under either standard in this case, we will refrain from discussing the applicable standard until our supreme court resolves the conflict. *Anderson*, 407 Ill. App. 3d at 676.

¶ 54    That being settled, the State points out that defendant has forfeited several of the issues he now raises because he failed to object at trial and/or failed to include the issue in his postrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Specifically, the State asserts that forfeiture precludes this court from considering the following issues: (1) the State "exploited" Mafia evidence where the arguments were based upon facts not contained in the record; (2) the State improperly shifted the burden of proof to him when the prosecutor argued that defendant's gun, similar to that used in the shooting, was never found or analyzed; and (3) the State argued improper hearsay during closing argument.

¶ 55    Our careful review of the record in this case reveals that defendant did indeed forfeit the issues as noted by the State. However, we may consider plain errors or defects that affect substantial rights, even though the errors were not raised at trial. Ill. S. Ct. R. 615(a); *People v. Herron*, 215 Ill. 2d 167, 187 (2005). The plain error doctrine allows consideration of an otherwise forfeited error when:

        "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is

serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 187.

Before assessing whether we can consider defendant's claims under the plain error doctrine, we must consider whether plain error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 56                                    1. Forfeited Errors

¶ 57    It is well settled that prosecutors are afforded wide latitude in closing argument, and even improper remarks do not merit reversal unless they result in substantial prejudice to the defendant. *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994). During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel which clearly invite response, and comment on the credibility of witnesses. *People v. Rader*, 178 Ill. App. 3d 453, 466 (1988). In reviewing whether comments made during closing argument are proper, the closing argument must be viewed in its entirety and remarks must be viewed in context. *Kitchen*, 159 Ill. 2d at 38.

¶ 58    Defendant's first challenge is to the State's "exploitation of Mafia evidence" during closing argument. Defendant is not, however, challenging the admissibility of the Mafia evidence. Instead, defendant argues that the prosecutor's repeated references to the Mafia, remarks about goons, as well as references to testimony unsupported by the record, created a false and improper impression that defendant was associated with organized crime and resulted in unfair prejudice that warrants a new trial.

¶ 59    Defendant fully expected that the State's witnesses would testify that they did not implicate defendant around the time of the offense based on their subjective beliefs that defendant was in the Mafia. Prior to trial, the parties agreed that they would stipulate to the fact that there was no evidence to suggest that defendant was involved in the Mafia or organized crime. The parties ultimately stipulated as follows:

"That members of the Chicago Police Department did a complete and thorough background check on the Defendant, Michael Cosmano, in an effort to determine whether or not the Defendant had any connection with organized crime or the Mafia. This background check did not find any evidence that the Defendant was in any way connected to organized crime or the Mafia at any time."

¶ 60    Despite the fact that there was no evidence that defendant was connected to organized crime or the Mafia, several of the State's witnesses testified that they did not implicate defendant during the initial investigation in 1981 because they believed he was in the Mafia or had connections to organized crime. Herman Rivera testified that he did not come forward because defendant is "from the mob." Defendant's objection to that comment was sustained.

-10-

The State then asked if Rivera believed "that Mike was involved in any kind of organized crime," to which Rivera replied "I didn't know that for sure." Juan Torres also testified that he did not tell the police that he saw defendant shoot Rodriguez because he was afraid of defendant, that everyone was afraid of defendant because "probably they think it was a Mafia guy." Torres testified that after the shooting "some men" came to Bella's Pizza and he signed some papers because the men told him to. Jim Bufka testified that after the shooting two men came to Bella's Pizza and escorted him to a lawyer's office where several other men who purported to be ex-federal law enforcement were waiting. Bufka did not contact the police before or after this meeting because "there were a lot of rumors about" defendant being involved in the Mafia or organized crime. Carmen Murillo testified that he was present at Bella's Pizza on the night of the shooting. He never spoke to the police because "Mr. Cosmano had–had a lot of friends, friends in the Mafia." Murillo's explanation prompted a motion for a mistrial by the defense, which was denied. Florence Balsitis testified that shortly after witnessing the shooting, her father grabbed her and told her, "you didn't see a thing. You don't say anything. You just come with me. Never talk about this again." She further testified that she did not identify defendant in 2008 because she was scared for her family. She had heard rumors that defendant was related to organized crime.

¶ 61     During closing argument, defense counsel called the witnesses' credibility into question based on the fact that they waited 26 years to tell the police what happened on June 12, 1981. Defense counsel stated:

"Nowhere, ladies and gentlemen, are you going to be told in those instructions that if you wait 28 years to tell the police what you know you get a pass on credibility. Nowhere is it going to say that. Nowhere is it going to say, oh, overlook the fact that not one of theses people said they saw a murder on June 12, 1981. The judge is not going to instruct you, oh, they get a pass because they are scared. Well, if they are scared of Mike, maybe they are scared of Latin King. Maybe they are scared of another driver. Maybe they are scared of another manager. Who knows. We don't know. And we can't go inside their heads to figure it out. But I will tell you one thing, we don't have to buy that bull that he was in the Mafia, or the mob, or that he was associated because he is an Italian and he ran a pizza parlor and he worked hard. He owned Bella's and he opened up another one in Norridge. That is a working stiff. And he's is [*sic*] member of the mob. Give me a break. You talk about prejudice. Why don't you just call [him] a grease ball."

¶ 62     In rebuttal closing, the State responded to defense counsel's argument regarding the credibility of the witnesses. The State remarked:

"They are terrified of somebody. He is not in the Mafia. He never had anything to do with the Mafia. That is not the issue. The issue is what did those witnesses believe. And when they just saw him shoot a guy down in front of him and hand the gun to an off-duty Chicago Police Officer, you're going to think, well, maybe this guy is in the Mafia. And the rumors were out there. Yes. That is what they believed. That is why they were terrified.

* * *

And there is no reason that [Florence] Balsitis would have come forward and got on

that witness stand and raised her hand and swore to tell the truth when you can see she is still afraid of that man. Her father told her don't talk to anyone. He is in the Mafia. He will kill our family. And she kept quiet.

Talk about Herman Rivera. Talk about a guy scared. Have you ever seen anybody as scared as he was on the witness stand? He was terrified. 29 years after the fact he is still terrified that that man is going to kill him because he is in the Mafia. And he didn't want to say that he saw defendant shoot and kill Milton Rodriguez.

* * *

He also talked about the fact that–as Wilson Maldonado did, that the next day after the shooting–and you want to be scared about something? You think the guy is in the Mafia? What happens? A couple of goons come in, they say, 'we want to talk to you, we want you to sign some papers about what you saw.' Well, who are these guys? They have no idea. But they know this isn't normal. They are not the police. Torres said the same thing; that some people came in, these goons, wanted them to talk."

¶ 63    Undoubtedly, the prosecutor's Mafia comments were invited by the defense. The State may properly respond to comments made by defense counsel that clearly invite a response. *People v. Hudson*, 157 Ill. 2d 401, 444 (1993). Defense counsel questioned the reasonableness of the witness's belief that defendant was connected to the Mafia during closing argument. The prosecutor was merely answering defense counsel's remarks when he commented that the witnesses believed that defendant was in the Mafia and, as such, they were fearful of defendant.

¶ 64    Furthermore, the Mafia comments made by the prosecutor were reasonable inferences given the testimony of the witnesses. "To be proper, closing argument comments on evidence must be either proved by direct evidence or be a fair and reasonable inference from the facts and circumstances proven." *People v. Hood*, 229 Ill. App. 3d 202, 218 (1992). Several of the witnesses testified that they failed to implicate defendant in the shooting because they were fearful of defendant because they believed he was involved in the Mafia. While Balsitis did not testify that she feared defendant would kill her family, that inference is reasonable, given what is known about the Mafia. Likewise, Herman Rivera did not testify that he was afraid defendant would kill him, but the inference was proper, and therefore not error. With respect to the comments about the "goons," the prosecutor's word choice was poor, but did not amount to error. Therefore, plain error analysis is improper as to this issue.

¶ 65    Defendant also claims that the prosecutor improperly shifted the burden when it declared in rebuttal argument, "And we were never able to match the defendant's gun to this bullet. Because we don't have the defendant's gun. It's never been analyzed. *** We don't have that."

¶ 66    We find *People v. Williams*, 40 Ill. 2d 522 (1968), instructive on the issue of whether this comment by the prosecutor amounts to error. In *Williams*, our supreme court addressed a prosecutor's statements, after the State produced evidence that bullets recovered from two murder victims were of the same class as a gun known to have belonged to the defendant. In closing argument, the prosecutor stated:

" 'I don't believe for a second that this man's gun will ever turn up. It can't. He can't

-12-

afford to have that gun ever turn up. And we all know why he can't do that. We know why it hasn't turned up. We know why [the ballistics expert] has not been allowed to look at it to compare slugs fired from it with slugs in these plastic bags before you.' " *Williams*, 40 Ill. 2d at 527.

¶ 67    The defendant argued that the prosecutor's comments shifted the burden of proof and undercut his right against self-incrimination. *Williams*, 40 Ill. 2d at 527. In reviewing the defendant's claim, the *Williams* court noted that, "[a] careful analysis of the privilege and the reason for the prohibition reveals that their purpose is to prevent prejudice to an accused from his failure to testify, but not to prevent prejudice to his case from his failure to produce evidence to establish his defense." (Emphasis omitted.) *Williams*, 40 Ill. 2d at 527. The court then went on to discuss how a defendant's failure to call a witness or to produce evidence is a proper consideration for the jury and therefore a "legitimate subject of comment by the prosecution." *Williams*, 40 Ill. 2d at 529.

¶ 68    Under *Williams*, the subject of defendant's failure to produce a gun, evidence of which adduced at trial indicated was registered to him, or his failure to explain the absence of the gun was a "legitimate subject of comment by the prosecution" during rebuttal closing argument. See *Williams*, 40 Ill. 2d at 529. The prosecutor did not suggest that defendant was under a duty to present evidence or to abandon his right against self-incrimination. The prosecutor merely pointed out the absence of ballistics evidence in this case. Therefore, no error occurred and plain error analysis is unnecessary.

¶ 69    Defendant next argues that the State argued "rank hearsay" as substantive evidence in closing argument, when it remarked on an out-of-court identification of defendant by a deceased witness. In rebuttal closing argument the prosecutor remarked:

"But somebody did come forward on the 13th of June, and that was Guillermo Carmen Valencia Navas. Or, as we know him, Willie. Willie came forward. We know from the evidence that Willie came forward. Willie is dead. Willie never testified. Willie was the day manager. And Willie came forward and walked into a police station and told the police officers-and how do we know this? Because we can infer. After Detective Griffin talked to Willie, he started looking for Michael Cosmano back in 1981. That is [*sic*] guy that had information that did the shooting. Because Willie told. Or they wouldn't have been looking for him. He wouldn't have called his attorney, Anthony Onesto, and asked him to bring his client that Willie told them what happened."

¶ 70    Defendant analogizes the prosecutor's remarks with those found to be reversible error in *People v. Rivera*, 277 Ill. App. 3d 811 (1996). In *Rivera*, a detective testified that when the defendant and two other men stepped out of the squad car, people identified them as the perpetrators by saying, "yeh, that's them." The court sustained defense counsel's objection to the statement and instructed the jury to disregard the statement. Later, the prosecutor referenced the stricken testimony when he asked the detective, "[b]ased on that conversation did you do anything with the defendant and the other two?" The detective responded that he "took them over to the area, 11th, 727 east 111th" and turned them over to police personnel. During closing argument, the prosecutor said:

" 'Officer Brown wasn't there when the shooting occurred either, but Officer Brown

told you he was out there covering the scene, he received information, went to a nearby location, just a couple of blocks away and Officer Brown makes an arrest. He sees these guys, brings them over there. One guy has a checkered shirt with the war colors on it. Brings them over, has a conversation with some citizens and he runs these guys into the detectives.' " (Emphasis omitted.) *Rivera*, 277 Ill. App. 3d at 818.

¶ 71    The *Rivera* court found the out-of-court identification testimony and the subsequent comments regarding the same during closing argument resulted in error. The court held that the resulting prejudice from an out-of-court identification by people who cannot be cross-examined to be "palpable" and found that "[h]earsay testimony identifying the defendant as the one who committed the crime cannot be explained away as 'police procedure,' even where the trial judge limits the evidence to a nonhearsay purpose." *Rivera*, 277 Ill. App. 3d at 819-20 (citing *People v. Singletary*, 273 Ill. App. 3d 1076, 1084 (1995)).

¶ 72    The State argues that the comments made by the prosecutor during closing argument differ from the out-of-court identification testimony in *Rivera*, because the prosecutor's argument simply detailed the course of the police investigation. The State likens the testimony and comments made during closing argument to those found in *People v. Henderson*, 142 Ill. 2d 258 (1990) (declined to follow on other grounds *People v. Terry*, 183 Ill. 2d 298 (1998)).

¶ 73    In *Henderson*, our supreme court held that a defendant's sixth amendment right is not infringed upon by testimony recounting steps taken in a police investigation, "even if a jury would conclude that the police began looking for a defendant as a result of what nontestifying witnesses told them, as long as the testimony does not gratuitously reveal the substance of their statements and so inform the jury that they told the police that the defendant was responsible for the crime." *Henderson*, 142 Ill. 2d at 304. The court determined that the testimony of a police officer that involved the issue of whether defendant became a suspect after the police talked to another witness was merely a recounting of the steps taken in a police investigation. However, the *Henderson* court agreed with the defendant that "it was error for the prosecutor to say in his closing argument that the police talked to Alonzo and 'he is kind of helping ***. He gives them certain information. He tells them about Croft and Henderson.' " *Id.* at 305. The court found that this comment was improper because "it suggested the content of Alonzo's statements to the police." *Id.* Nevertheless, the court found the error to be harmless where the trial court sustained an objection to the comment. *Id.*

¶ 74    As in *Rivera*, the prosecutor's comments in closing argument in this case went beyond recounting the steps taken in the police investigation and beyond inferring that Willie implicated defendant. Like the comments made during closing argument in *Henderson*, the prosecutor's comment suggested the content of Willie's statement to the police. The prosecutor went from toeing the line to taking a giant leap over it when he stated, "[t]hat is [*sic*] guy that had information that did the shooting. Because Willie told. Or they wouldn't have been looking for him. He wouldn't have called his attorney, Anthony Onesto, and asked him to bring his client that Willie told them what happened." Clearly, the prosecutor's statement regarding the out-of-court identification of defendant was error.

¶ 75    Does this error amount to plain error? Defendant argues that the evidence in this case was closely balanced and therefore he has demonstrated plain error under the first prong. Whether the evidence is closely balanced is a separate question from whether the evidence is sufficient to sustain a conviction beyond a reasonable doubt. *Piatkowski*, 225 Ill. 2d at 565. The closely balanced standard errs on the side of fairness and grants a new trial even if the evidence was otherwise sufficient to sustain a conviction. *In re M.W.,* 232 Ill. 2d 408 (2009).

¶ 76    Contrary to defendant's argument, he cannot establish prejudice from this error given the evidence in this case. Although there was no physical evidence in this case, no fingerprints, no DNA, and no ballistics evidence, eight witnesses testified that defendant shot and killed Milton Rodriguez. Frank Mildenberger testified that he saw a man whom he believed to be the owner of Bella's Pizza shoot and kill Milton Rodriguez, who was sitting on a wall in the alley. Herman Rivera, Wilson Maldonado, Enrique Maldonado, Juan Torres, James Bufka and Florence Balsitis testified that they saw defendant shoot and kill Milton Rodriguez as he sat on a low wall in the alley. Carmen Murillo was in the kitchen and observed defendant walk out into the alley with a gun, heard a gunshot moments later, and then observed defendant return to the kitchen with the gun. While all of these witnesses other than Mildenberger waited 26 years to come forward with information implicating defendant, the trier of fact is in the best position to determine the credibility of the witnesses, to resolve any inconsistencies or conflicts in their testimony, to assess the proper weight to be given to their testimony and to draw reasonable inferences from all of the evidence. *People v. Cochran*, 323 Ill. App. 3d 669, 679 (2001). Because the evidence was not closely balanced, any error in closing argument did not affect the outcome of the trial and defendant cannot demonstrate plain error under the first prong.

¶ 77    Likewise, defendant cannot establish plain error under the second prong of the plain error analysis because the error in closing argument was not a structural error. Under the second prong, the defendant must prove there was plain error and that the error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 187.

¶ 78    Error under the second prong of plain error analysis has been equated with structural error, meaning that automatic reversal is only required where an error is deemed to be a systemic error that serves to "erode the integrity of the judicial process and undermine the fairness of the defendant's trial." (Internal quotation marks omitted.) *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009). In other words, "[a]n error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *People v. Thompson*, 238 Ill. 2d 598, 609 (2010). Structural errors have been recognized in only a limited class of cases, including: a complete denial of counsel; trial before a biased judge; racial discrimination in the selection of a grand jury; denial of self-representation at trial; denial of a public trial; and a defective reasonable doubt instruction. *Thompson*, 238 Ill. 2d at 609. Error in closing argument does not fall into the type of error recognized as structural. Therefore, defendant has not established plain error under the second prong.

¶ 79                                    2. Preserved Errors

¶ 80    Defendant also raises two claims with respect to closing argument that were not forfeited. First, defendant claims that the State made an improper comment about his attorney that penalized him for exercising his sixth amendment right to counsel. Second, defendant argues that during rebuttal closing argument, the prosecutor improperly commented on defendant's failure to produce evidence, thereby shifting the burden of proof to defendant.

¶ 81    With respect to the first claim, during rebuttal closing argument, the prosecutor stated:

"He also talked about the fact that–as Wilson Maldonado did, that the next day after the shooting–and you want to be scared about something? You think the guy is in the Mafia? What happens? A couple of goons come in, they say, 'we want to talk to you, we want you to sign some papers about what you saw.' Well, who are these guys? They have no idea. But they know this isn't normal. They are not the police. Torres said the same thing; that some people came in, these goons, wanted them to talk. Well, why would they–he said he thought they were working for Mike Cosmano's lawyer. Well, if he didn't shoot anybody, why is Mike Cosmano's lawyer–Anthony Onesto was his lawyer back then–."

¶ 82    Defense counsel objected and the court instructed the jury to disregard "that statement." Defense counsel then indicated that he "had a motion," to which the court responded "I understand. Later. The jury will completely disregard that last statement made by the prosecution."

¶ 83    The State then continued with its rebuttal closing argument. At the conclusion, and outside the presence of the jury, defense counsel told the judge, "[b]ased on several comments made by [the prosecutor], we are going to move for a mistrial, specifically, the comment about the lawyer on June 12th or June 13th." The court noted that it "gave a cautionary instruction about it." Defense counsel responded that he appreciated the court's attempt to remove the inference, "but I respectfully suggest to the Court it was pretty well recognized that is [*sic*] an inference that is very difficult for a court to remedy." The court denied defense counsel's request for a mistrial.

¶ 84    Citing *People v. Meredith*, 84 Ill. App. 3d 1065 (1980), defendant argues that the prosecutor's comment was designed to show consciousness of guilt and had the effect of punishing defendant for exercising his sixth amendment right to counsel. In *Meredith*, the defendant argued that the prosecutor's closing argument questioned his innocence because he sought the assistance of counsel, thereby penalizing him for exercising his sixth amendment right. In closing argument, the prosecutor stated that " 'he says that he talked to these people *** he called his lawyer ***. *** I submit he knew he had shot those people [and] that is why he went to go call his lawyer.' " *Meredith*, 84 Ill. App. 3d at 1071. On appeal, this court concluded that the prosecutor's comment regarding the defendant's phone call to his attorney the morning after the shooting was prejudicial error. The *Meredith* court reasoned that the comment and resulting inference equated defendant's guilt with the exercise of his sixth amendment right, thereby punishing him for exercising that right. In reversing defendant's conviction and remanding for a new trial, the court held that the error was not harmless where the evidence was not overwhelming and the verdict relied on the

jury's assessment of the credibility of the witnesses in determining which version of the events to believe. *Meredith*, 84 Ill. App. 3d at 1071.

¶ 85    The State does not contest defendant's assertion that, under *Meredith,* the prosecutor's argument to the jury regarding defendant's exercise of his sixth amendment right to an attorney was improper. The State argues that any error was cured by the trial judge's subsequent admonishments and instructions to the jury.

¶ 86    Defendant cites *People v. Lewis*, 269 Ill. App. 3d 523 (1995), in support of his contention that the trial court's subsequent admonishment and instructions to the jury did not cure the error. In *Lewis*, a witness made a reference to a polygraph examination taken by the victim. The trial judge sustained defense counsel's objection to the comment, struck the comment from the record and instructed the jury to disregard the statement. Defense counsel made a motion for a mistrial, which was denied. On appeal, the defendant argued that the trial court should have granted a mistrial based on the comment because he was denied a fair trial.

¶ 87    In determining whether the trial court abused its discretion in denying the request for a mistrial, the *Lewis* court noted that "[t]he Supreme Court of Illinois has repeatedly and emphatically condemned references at trial to polygraph examinations, particularly when a jury might consider such a reference to constitute some evidence of defendant's guilt." *Lewis*, 269 Ill. App. 3d at 527 (citing *People v. Baynes*, 88 Ill. 2d 225 (1981), and *People v. Gard*, 158 Ill. 2d 191 (1994)). Reasoning that the improper polygraph reference could have substantially enhanced the credibility of the victim in the eyes of the jury, the court found that although the trial court did its best to " 'unring the bell,' " the polygraph reference denied defendant his right to a fair trial. *Lewis*, 269 Ill. App. 3d at 527.

¶ 88    Potential prejudice associated with improper remarks of a prosecutor is usually cured by "the prompt sustaining of an objection combined with proper jury instruction." *People v. Johnson*, 208 Ill. 2d 53, 116 (2003). Therefore, prompt action on the part of the trial judge to admonish the jury to disregard the prejudicial statement may have some impact on the resulting prejudice and is material to the analysis. See *People v. Naujokas*, 25 Ill. 2d 32, 35-36 (1962).

¶ 89    Here, the trial judge in this case certainly did what he could to reduce the impact of the statement on the jury's collective mind by instructing the jury to disregard the statement. Immediately after the prosecutor's statement, the trial court told the jury to "completely disregard that last statement made by the prosecution." At the conclusion of closing argument, the trial judge addressed the jury and stated:

    "Ladies and gentlemen, I'm going to give you a cautionary instruction right now. The prosecutor made reference to an attorney. That was very inappropriate, and you should totally disregard that. Everybody has a Constitutional right to talk to a lawyer, both by the state Constitution and by our United States Constitution. No inference can be drawn whatsoever from consulting with an attorney. As I said, totally disregard what the prosecutor said. He was wrong and should have never said that."

¶ 90    Subsequently, the court instructed the jury:

    "Closing arguments are made by attorneys to discuss the facts and circumstances in the case, and should be confined to the evidence and to the reasonable inferences to be

-17-

drawn from the evidence.

Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 91 The prosecutor's comment here regarding defendant contacting his attorney was undoubtedly improper. However, any potential prejudice was cured by the trial court's prompt, repetitive admonishments to the jury and subsequent instruction.

¶ 92 Second, defendant argues that during rebuttal closing argument, the prosecutor improperly commented on defendant's failure to produce evidence, thereby shifting the burden of proof to defendant. At trial, there was some testimony regarding Vega, a driver for Bella's pizza, who was in the alley and possibly with Rodriguez at the time of the shooting. During rebuttal closing argument, the prosecutor stated,

"Where is Vega? I don't know. The police were never able to find out who Vega was. People wouldn't cooperate. Ask yourself, 'is there somebody that could have told the police, or could have told you who Vega was?' Where did he work? Vega was a driver. He was a driver for the Defendant. So if anybody has the key to finding Vega, it's the defendant."

¶ 93 Defense counsel objected and stated he had "a motion." The court overruled the objection stating it "is a fair comment. You opened it up." The court then told the jury that "the burden of proof is always on the State and lasts with State throughout each and every phase of the trial. The burden never shifts to Mr. Cosmano."

¶ 94 The State responds by arguing that defendant invited the comment. During closing argument, defense counsel argued: "He and others put a guy at the scene that nobody seems to want to talk about. A guy by the name of Vega who was with Milton Rodriguez. Was with him before the shots were fired. Nobody assists anybody in finding Vega." We agree with the State that the comment regarding Vega was invited by defense counsel. During closing argument, defense counsel reminded the jury about Vega and questioned Vega's absence from this case by inferring that perhaps Vega was intentionally left out because he may have implicated someone other than defendant. In response to defense counsel's argument, the prosecutor pointed out in rebuttal that if Vega had exculpatory evidence, defendant should have located him and called him as a witness. The State may properly respond to comments made by defense counsel that clearly invite a response. *People v. Hudson*, 157 Ill. 2d 401, 444 (1993).

¶ 95 We also find that, as with defendant's argument regarding the prosecutor's comment about the absence of the gun, the prosecutor's comment about defendant's failure to call Vega was a "legitimate subject of comment by the prosecution" during rebuttal closing argument. See *Williams*, 40 Ill. 2d at 529. Thus, the burden of proof was not improperly shifted to defendant. See *People v. Kliner*, 185 Ill. 2d 81, 154-55 (1999).

¶ 96                                 B. Admission of the Gun

¶ 97 Defendant also claims that the State improperly introduced hearsay evidence and

propensity evidence when they elicited testimony from a police officer regarding a gun recovered at the time of defendant's arrest, a gun which was of the same caliber used in the shooting.

¶ 98    On direct examination of Detective Rodriguez, the prosecutor elicited that he had driven to Naperville in response to news about defendant's arrest. The prosecutor asked:

"Q. And when you got there did you find that something was recovered from Mr. Cosmano at the time of his arrest?

A. Yes, I did.

Q. And what was that?

A. It was a 45 caliber semi-automatic pistol."

After Detective Rodriguez admitted that he did not recover the weapon, defense counsel objected stating that Detective Rodriguez did not have any personal knowledge of the recovery of the gun and his testimony amounted to inadmissible hearsay.

¶ 99    The next morning, defendant moved for a mistrial based on Detective Rodriguez's testimony regarding the recovery of a .45 when defendant was arrested. Defendant argued that because the .45 recovered was not the .45 used in the shooting, "[t]he only reason the evidence could have been offered was to show propensity that Mr. Cosmano carries a 45." The State responded that defendant had waived his propensity argument where it was not the basis of the initial objection the previous day. The court stated, "[s]o it seems that you're–it's sort of a gray area–that more or less it seems like you're objecting to the chain and then, as an after thought, to the evidence of the weapon. All right, motion for mistrial is denied."

¶ 100   The court then instructed the jury that, "On May 6, 2008, Mr. Cosmano was arrested and there was a weapon recovered. That weapon has nothing to do with this case. So any testimony concerning that weapon should be totally disregarded."

¶ 101   The State responds that while the evidence of the gun was admissible, the manner in which it was admitted was improper. We agree that Detective Rodriguez's testimony regarding the gun was inadmissible hearsay and given the State's concession, do not need to embark on a lengthy discussion of the finer points of hearsay.

¶ 102   The State remarks, however, that "evidence of the gun was admissible where it was connected to defendant and was capable of the commission of the murder. The fact that it was later discovered that it was not the weapon used did not change the fact that it was admissible." A weapon is generally admissible if it is connected to both the defendant and the crime. *People v. Babiarz*, 271 Ill. App. 3d 153, 159 (1995). In cases where the weapon used in the offense is not recovered, but a weapon is seized from defendant and is suitable for commission of the charged offense, a connection between the two weapons is sufficiently present. However, in cases where the weapon seized from defendant has been established not to be the weapon used in the charged offense, there is some inconsistency as to whether the admission of the weapon is reversible error. *People v. Carrero*, 345 Ill. App. 3d 1, 14 (2003) (citing *People v. Brown*, 100 Ill. App. 3d 57, 65 (1981)); but *cf. People v. Wade*, 51 Ill. App. 3d 721 (1977).

¶ 103   In *People v. Wade*, 51 Ill. App. 3d 721 (1977), when the defendant was arrested, he was

found with a .357 Magnum, which was not the gun used in the shooting in that case. The prosecutor elicited extensive testimony about the gun from the arresting officer. The officer not only testified that the gun was fully loaded and was concealed in the defendant's clothing, but also that, in his opinion, a shot from the weapon would pierce a car's bumper. *Wade*, 51 Ill. App. 3d at 723. The *Wade* court held that a gun cannot be admissible as a weapon suitable for the commission of a murder, where the State "knows and concedes that ballistics tests show that it was not the weapon used." *Wade*, 51 Ill. App. 3d at 729.

¶ 104     The facts of this case are distinguishable from *Wade* however. Unlike *Wade*, in this case, there was not extensive evidence admitted regarding the particular gun recovered on defendant's arrest. The testimony was limited to the facts surrounding the arrest and the type of gun recovered. Furthermore, there was no ballistics test admitted into evidence in this case showing that the gun recovered upon defendant's arrest was not the weapon that was used in the commission of the murder. Moreover, a cartridge case recovered from the scene of the crime in 1981 was recovered and ballistics tests revealed that it was fired from a .45-caliber gun. At the time of his arrest, defendant was in possession of a gun that could fire a .45-caliber bullet.

¶ 105     Even if introduction of the gun evidence was improper, the erroneous admission of this hearsay evidence was harmless. The erroneous admission of hearsay evidence will be considered harmless only "where there is no reasonable probability that the jury would have acquitted the defendant absent the hearsay testimony." *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990). As we have already discussed, the evidence in this case was not closely balanced. There were eight witnesses who testified that defendant shot and killed Milton Rodriguez. Furthermore, any prejudice would have been cured by the court's instruction to the jury. *People v. Speight*, 153 Ill. 2d 365, 373 (1992).


¶ 106                              C. Perjured Testimony and *Brady* Violation

¶ 107     Defendant next contends that he is entitled to a new trial when the State knowingly used perjured testimony and failed to disclose certain evidence in discovery in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Defendant claims that Florence Balsitis testified falsely when she stated that she told the prosecutor that defendant changed his appearance between the time of the shooting and the time of the lineup. Defendant argues that the State's failure to inform him of Balsitis' allegation regarding defendant's changed appearance violated rules of discovery and his right to due process where he could have used that information for impeachment.

¶ 108     Balsitis testified that defendant's hair was different than he usually wore it in the lineup photograph from 1981. Balsitis testified that defendant wore his hair slicked-back at the time of the shooting, but that his hair in the lineup photograph was not slicked back and was puffy. Balsitis testified that she first told prosecutors about the difference in defendant's appearance in December 2009. Right after her testimony, the parties stipulated that the first time Balsitis mentioned anything about defendant's hair appearing different in the lineup photo was on January 10, 2010, on the eve of trial.

¶ 109     It is well established that the State's knowing use of perjured testimony to obtain a

criminal conviction violates a defendant's right to due process of law. *People v. Olinger*, 176 Ill. 2d 326. 345 (1997). "A conviction obtained by the knowing use of false testimony [will] be set aside if there is a reasonable likelihood that the false testimony could have affected the verdict." *People v. Thurman,* 337 Ill. App. 3d 1029, 1032 (2003). These principles are also applicable when the State, while not soliciting false testimony, fails to correct it when it occurs. *Thurman,* 337 Ill. App. 3d at 1032.

¶ 110    The State did not allow Balsitis' incorrect testimony to stand. The parties stipulated that Balsitis first told the State about the change in defendant's appearance on January 10, 2010, thereby correcting any possible false testimony.

¶ 111    Defendant also alleges that the State violated discovery rules when it did not inform the defense of the contents of Balsitis' conversation with the prosecutor wherein she stated that defendant's appearance was different than usual in the lineup photograph.

¶ 112    In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that the prosecution violates a defendant's constitutional right to due process of law by failing to produce evidence favorable to the accused and material to guilt or punishment. To prove that he was denied due process of law under *Brady*, defendant must show that: (1) the evidence is favorable because it is exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence was material to guilt or punishment*. People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008).

¶ 113    To determine whether the evidence in this case, *i.e.*, Balsitis' allegation that defendant's appearance had changed for the lineup photograph, is material we need not examine the sufficiency of the evidence; rather, defendant must show that the favorable evidence could reasonably have put the whole case in such a different light as to undermine confidence in the verdict. *People v. Coleman*, 183 Ill. 2d 366, 393 (1998).

¶ 114    Applying the *Brady* standards to the facts of this case, it is clear that the State did not violate any discovery rules. The content of Balsitis' statement regarding defendant's appearance was not exculpatory, it was inculpatory. Similarly, Balsitis' allegation was not impeaching. The only other witness who testified regarding the description of the shooter was Mildenberger, who testified that the shooter had straight, combed-back hair. Furthermore, defendant was not prejudiced by the delay in disclosing this information. The fact that Balsitis waited until the eve of trial to tell anyone about defendant's changed appearance only affected her credibility.

¶ 115                                         D. Juror

¶ 116    Last, defendant complains that the trial court erred in not excusing a juror. Prior to the start of the third day of trial, a deputy sheriff informed the court that a juror had approached him that morning and told him "she felt frightened because she saw defendant getting out of a car in the parking garage." The court subsequently questioned the juror:

        "THE COURT: All right. And then you expressed some kind of consternation or fear about that, is that correct.

JUROR: I expressed some concern

THE COURT: Okay. Good. Could you let us know what that was?

JUROR: I just was wondering if they should be parking in the same garage as we–we were parking in.

THE COURT: Okay. And I can give you a quick answer on that: Absolutely not. All right? I don't know the situation about the matter at the door over there. All right. But here's the whole thing is would that effect you in any way in giving [defendant] a fair trial?

JUROR: No, sir.

THE COURT: All right. It will not happen again. All right. Did you discuss any of this with your brother or sister jurors?

JUROR: No.

THE COURT: And so it was consternation or concern about why he was parking over in the county or jury parking lot?

JUROR: Exactly.

THE COURT: Once this is eliminated, which it will almost immediately, then is that the end of your concern?

JUROR: Yes.

THE COURT: All right. I want you to take a look at [defendant]–Can you give him a fair trial?

JUROR: Yes."

¶ 117    Following this colloquy, defense counsel had an opportunity to question the juror and began by telling the juror that "some people who come to this building believe that that's a public parking lot." The court quickly ended this type of inquiry. Defense counsel then asked the juror if she would "hold it against Mr. Cosmano because you think that he thought he wasn't allowed to park there." The juror answered "no." The court then asked the juror whether she felt the matter had been resolved and she answered "yes." The juror also indicated that she felt comfortable sitting as a juror in this case and could give defendant a fair trial. The court then instructed the juror not to discuss the matter with the other jurors.

¶ 118    Outside the presence of the juror, the court asked the parties if they had any objections to the juror remaining on the jury. Defense counsel moved to dismiss the juror for cause because the trial court made defendant "look like he was violating some county regulation which he was not" and "indicated to that juror he shouldn't have been parked there." The court responded, "I have judicial notice and I can do that." The State responded that the "lot is clearly marked jurors and employees only" and that defendant "is not supposed to park there." The court thereafter denied defendant's request to remove the juror and denied defendant's request for a mistrial.

¶ 119    The crux of defendant's argument is that the juror should have been dismissed because she was prejudiced against defendant as a result of the trial court's announcement that defendant was "absolutely" wrong for parking in the juror parking lot. The question of

-22-

whether jurors have been influenced and prejudiced "to such an extent that they would not, or could not, be fair and impartial" involves a determination that must rest in sound judicial discretion. *People v. Whitehead*, 169 Ill. 2d 355, 402 (1996), *overruled in part on other grounds*, *People v. Coleman*, 183 Ill. 2d 366 (1998). After the judge has made an appropriate inquiry, the trial judge has wide discretion in deciding how to handle and respond to juror bias because the judge can appraise the jurors face to face, something a court of review cannot do. *People v. Runge*, 234 Ill. 2d 68, 105-06 (2009).

¶ 120     In the instant case, the court conducted a proper inquiry into the juror's concerns. The juror did not allege any improper contact on the part of defendant. The juror merely expressed concern that defendant was parked in the juror parking lot. After some questioning, the juror indicated that her concern would end once defendant was instructed he was not to park in the juror parking lot. In addition, the juror stated three separate times that she was capable of giving defendant a fair trial. Given the facts and the circumstances, we cannot say that the trial court abused its discretion in denying defense counsel's request to dismiss the juror. The court's determination that the juror could be fair and impartial was not an abuse of discretion.

¶ 121                                CONCLUSION

¶ 122     Based on the foregoing, the judgment of the trial court is affirmed.

¶ 123     Affirmed.