2020 IL App (1st) 172316-U

No. 1-17-2316

Order filed December 11, 2020

SIXTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No.  11 CR 19824 |
| | ) | |
| MARCUS JACKSON, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Mikva and Justice Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's convictions over his contention that the State improperly shifted the burden of proof during rebuttal argument. Defendant's sentences were not excessive when the trial court appropriately considered the mitigating and aggravating factors and the sentences were within the applicable statutory range.

¶ 2    Following a jury trial, defendant Marcus Jackson was found guilty of two counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(2), (3) (West 2004)) and sentenced to two consecutive 20-year prison terms. On appeal, defendant contends that the State improperly shifted the burden of proof during rebuttal argument by stating that he could not merely argue that

the victim's testimony was unreliable but had to "prove it." He further contends that his 40-year sentence is excessive because the trial court failed to consider the statutory factors in mitigation. We affirm.

¶ 3    Following his November 2011 arrest, defendant was charged with multiple counts of attempt first degree murder, aggravated criminal sexual assault, and criminal sexual assault arising from a January 1, 2005 incident involving T.B.[1]

¶ 4    Prior to trial, the State sought leave to admit evidence of other crimes pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2010)) to show defendant's propensity to sexually assault and strangle intoxicated women. After hearing argument, the trial court ruled that the State could only introduce this evidence if defendant testified that his encounter with T.B. was consensual. The State then filed a certificate of substantial impairment. On appeal, we affirmed the trial court. See *People v. Jackson*, 2014 IL App (1st) 130525-U. The matter proceeded to a jury trial on eight counts of aggravated criminal sexual assault.

¶ 5    T.B. testified that on December 31, 2004, she met friends at a bar to celebrate New Year's Eve, drank alcohol until she was intoxicated, and left the bar alone shortly before 2 a.m. She walked for 20 minutes trying to catch a taxi but became disorientated. At that time, she was dating Matthew Partman, who worked at the bar she just left. T.B. called Partman three or four times asking him to get her, but the calls went to voicemail. Eventually, a man approached T.B. and offered to help her get home safely. She identified defendant in court as this person. Defendant

_____

[1] At the time of trial, T.B. was known as T.P. For the sake of clarity, this order will refer to her as T.B.

accompanied T.B. to her apartment building and followed her inside. She did not ask defendant to walk her home or come inside. When T.B. entered an elevator, defendant kissed her. She thought defendant would accompany her to her front door and "that was it." However, as she unlocked the door, defendant threw her inside and slammed the door.

¶ 6      T.B. grabbed a phone and said she would call her boyfriend who would be home any minute. Defendant threw the phone and pushed her to the ground. During the struggle, a chair fell. Defendant dragged T.B. to a bedroom, shoved her facedown onto a bed, and put a pillow over her face. T.B. thought she would die and begged defendant not to kill her. Defendant told her not to scream and let go of her head. Then, defendant ripped off her underwear and threw it away. He "shoved" his fingers and penis inside her vagina. After a few minutes, defendant said, "this isn't working," stopped, and went to the bathroom. He repeatedly asked if T.B. would call the police and would not leave until T.B. said she would not. After defendant left, T.B. locked the door and called Steven McNeela, a childhood friend and ex-boyfriend, who was a police officer. She was hysterical and crying. After their conversation, paramedics came to her home and took her to a hospital.

¶ 7      Following this incident, T.B. had bruises and scrapes, and her eyes were red where blood vessels had "popped" due to being suffocated. At the hospital, she underwent a pelvic exam and was photographed. T.B. identified these photographs at trial, as well as a photograph that showed a pair of underwear outside her bedroom door. She spoke to police officers at the hospital and her home, described the offender, and later went to a police station to provide a statement and verbal description so that a composite image of the offender could be made. Five years later, in October 2011, she was contacted about a development in the case. She met with detectives at a police

station and viewed a photographic array. Two photographs looked similar and she did not identify anyone. On November 12, 2011, she viewed a physical lineup and identified defendant.

¶ 8    During cross-examination, T.B. testified that defendant "haunt[ed]" her brain every day. She acknowledged telling nurse Julia Busta that a black man with curly hair raped her. Although she and defendant spoke during the walk, she did not remember any details of the conversation. T.B. did not remember telling officers that defendant attacked her in the vestibule of her building, as she does not use that word. She did not recall saying she kissed defendant back, only that he kissed her. She told Chicago police detective Rita O'Leary that she tried to hail a taxi and called Partman. She told officers that defendant would not leave her apartment until she assured him she would not call the police. T.B. did not remember telling Chicago police officer Joann Hazard that defendant choked her outside her apartment or that she was unsure whether defendant "finished." T.B. wore makeup and jewelry that evening. She could not see makeup in the photograph of the pillow defendant used to suffocate her and agreed that she was wearing a bracelet and earrings in the photographs taken at the hospital. She denied falling off a bar stool.

¶ 9    McNeela, an Oak Lawn police detective, testified that he had known T.B. since he was a teenager and they previously dated. McNeela received a phone call from T.B. around 3:48 a.m. on January 1, 2005. She was crying, had difficulty talking, and was "in a state of shock." Following their conversation, McNeela contacted dispatch to have the Chicago police respond and then met T.B. at a hospital. T.B.'s eyes were bloodshot.

¶ 10    Busta testified that she performed a sexual assault evidence collection kit on T.B., who reported pentation by a finger and a penis and was unsure whether a condom was used. During the examination, she observed redness to T.B.'s neck and back, petechial hemorrhages below the eyes,

some redness to the whites of the eyes, and a scratch on the back. Additionally, there was minor darkening of the skin and an abrasion on the left upper arm, an abrasion to the right forearm, and what looked like a small cut on the lips. During an examination of T.B.'s genitalia, Busta noticed white "debris" by the lips of the vagina, a "mucoid" discharge in the vaginal canal, and redness. T.B. complained of tenderness in the neck and stated she was choked. T.B. also stated that she walked home at 4 a.m., the offender followed her for two blocks, and there were a lot of people around.

¶ 11    Retired Chicago police evidence technician Beverly Burch testified that she photographed T.B. at a hospital and retrieved a sexual assault evidence collection kit. In the photographs, T.B. is wearing a necklace, bracelet, and earrings. Burch also photographed T.B.'s apartment. She identified a photograph of black underwear on the floor in a hallway between the bathroom and the bedroom.

¶ 12    The State presented testimony establishing that T.B.'s vaginal swabs tested positive for the presence of semen, a DNA analysis was performed on the swabs, and a male DNA profile was generated. Additional testimony established that a buccal swab was obtained from defendant. An Illinois state police forensic scientist testified that a confirmatory DNA analysis was performed following an August 29, 2011 DNA association, and that the male DNA profile from the sperm fraction of T.B.'s vaginal swabs matched defendant's DNA profile.

¶ 13    Hazard, who was retired at the time of trial, testified that she and her partner responded to a criminal sexual assault call on January 1, 2005. T.B. was upset, crying, and had difficulty explaining what happened. Hazard observed red marks on T.B.'s neck and scratches and bruises on her left arm.

¶ 14   During cross-examination, Hazard testified that T.B. gave a physical description of the offender, including height, weight, age, and clothing. Hazard did not remember T.B. stating she was kissed in an elevator. Hazard initially testified that T.B. stated that the offender became violent in the building's vestibule. However, Hazard later testified that T.B. did not use the word vestibule; rather, Hazard's partner did. T.B. stated she was attacked in the doorway. Hazard did not remember whether T.B. was wearing makeup or jewelry because she was looking for injuries. T.B. stated that when the offender went to the bathroom, she opened her front door and waited for him to leave. Hazard did not remember T.B. stating there was a fight that resulted in a chair being knocked over or whether T.B. said she was digitally penetrated.

¶ 15   O'Leary, who was retired at the time of trial, testified that during her investigation she spoke with T.B., McNeela, and Partman. T.B. described the offender as a "male black mid 20s" with a medium complexion and short black hair and gave an estimated height and weight. When there were no further leads, O'Leary submitted a "suspended case report." In September 2011, the investigation restarted following a DNA association which linked defendant to the DNA recovered in this case.

¶ 16   During cross-examination, O'Leary testified that T.B. viewed a photo array which contained defendant's photograph but did not identify anyone. T. B. stated that she told defendant to leave and that when defendant went to the bathroom, she held the front door open for him.

¶ 17   Chicago police detective Joan Burke testified that T.B. was unable to identify defendant in a photographic array.[2] On November 12, 2011, T.B. identified defendant in a physical lineup.

---

[2] The State stated, at different times, that the photographic array took place on October 3 and October 23, 2011.

During a subsequent conversation, defendant told Burke he "usually" had sex on New Year's Eve. When shown a photograph of T.B., defendant said that if he had been with her, she would have pursued him, and asked why T.B. was "so special" that he would force her to have sex when he never forced anyone else. After being told that his DNA was recovered from T.B., he responded that if he had sexual intercourse with T.B., "she must have liked it."

¶ 18    The defense presented Partman, who testified that T.B. was intoxicated and fell while "navigating" the bar on December 21, 2004, but did not fall from a bar stool. He told her to wait for him to finish working and did not see her leave. The next morning, he had three or four voicemails from T.B. He later allowed O'Leary to listen to them.

¶ 19    The defense recalled O'Leary, who testified that during an interview, Partman stated that T.B. fell twice at the bar, needed assistance standing up, and left around 2 a.m.

¶ 20    The defense entered stipulations that Burch lifted a fingerprint from a toilet seat and a telephone at T.B.'s apartment and that the fingerprint card used by Chicago police officer Michael Malone contained defendant's fingerprints. Malone then testified that the latent print lifted from the toilet was suitable for comparison, but neither defendant nor T.B. could be eliminated as its source.

¶ 21    The defense also entered a stipulation that Dr. Varga saw T.B. on January 1, 2005, and her notes indicate that T.B. said the offender became violent in the building's vestibule, but because the word vestibule was not in quotes, that word cannot "with certainty" be attributed to T.B.[3]

¶ 22    In closing argument, the State posited that defendant acted as a Good Samaritan when he offered to walk T.B. home and then preyed on her. Trial counsel argued that T.B. changed her

---

[3] Dr. Varga's first name is not included in the report of proceedings.

story about where she was attacked and it was unbelievable that she permitted a stranger to follow her to her door. Trial counsel further argued that based on T.B.'s testimony, her underwear should not have been outside the bedroom and if she were attacked, she should not have been wearing jewelry in the photographs taken at the hospital. Additionally, trial counsel asked how the defense could "combat a statement from its inception meant to deceive, otherwise known as a lie," and concluded that the State had not met its burden. In rebuttal, the State noted that defendant posited a "conspiracy apparently by every single person who walked into this courtroom," and asked what would motivate the State's witnesses to lie. The State argued that T.B. related what happened "to the best of her ability," and asked:

> "Did you ever tell the same story over and over again? Sometimes you can't remember did I tell you that or did I tell the last person that? That doesn't mean she's lying. *** It doesn't make her a liar. But you can accuse someone of lying, but prove it."

The defense objected, and the trial court overruled the objection. The State then asked what evidence showed the State's witnesses were lying, and stated to the contrary the physical evidence corroborated what happened to T.B. The State submitted that to accept "none of this happened" would imply that a drunk girl "orchestrated a crime scene to corroborate a story she made up and is here in 2016 still telling you about." The State concluded that either T.B.'s identification or the DNA evidence was sufficient to convict defendant.

¶ 23    The trial court instructed the jury and it retired to deliberate. The jury later requested and received the transcript of T.B.'s testimony. The jury found defendant guilty of two counts of aggravated criminal sexual assault, one based on penetration by a finger and one based on penetration by a penis.

¶ 24     The defense filed a motion and amended motion for a new trial alleging, *inter alia*, discovery violations and that defendant was not proven guilty beyond a reasonable doubt. Following argument, the trial court denied the motion.

¶ 25     A presentence investigation report (PSI) showed that defendant had a 2008 conviction for criminal trespass to residence and a September 2005 conviction for driving under the influence, both of which postdate the offenses in the current case. Defendant served in the United States Marine Corps between 1999 and 2003, and worked at a construction company owned by his stepfather between 2013 and 2016. The PSI also stated that defendant suffered from seizures as a result of a brain injury suffered while in the military, and had been diagnosed with Post-Traumatic Stress Disorder (PTSD) and "Depression and Mood Disorder." The PSI further stated that defendant received treatment for alcohol addiction in 2008 and attended Alcoholics Anonymous meetings in 2011.

¶ 26     At sentencing, the State noted that the PSI did not include two convictions from California, a 2011 DUI conviction and a 2011 felony conviction for obtaining another's identification, and presented the trial court with certified copies of those convictions.

¶ 27     The State then presented Chicago police communications operator Lanita Williams-Smith, who receives and processes 911 calls. She received a call around 6:03 p.m. on December 29, 2013. An audiotape of the call was then played for the court.[4]

¶ 28     Chicago police officer Harrison testified regarding a December 29, 2013 incident during which defendant's guardians wanted him subdued and taken to a hospital.[5] Defendant did not

---

[4] This recording is not included in the record on appeal, and a transcript is not included in the report of proceedings.

[5] Harrison's first name is not contained in the report of proceedings.

comply when an officer tried to handcuff him. Harrison did not know if this failure to comply was because defendant was high or had a mental health issue.

¶ 29    The State also called J.J., who testified that she went to a bar on June 28, 2011, where she became "[b]eyond inebriated." Although she did not ask defendant for help or agree to go anywhere with him, she ended up at his apartment. Once there, she thought about leaving, but next remembered waking up on the floor topless with defendant straddling her. Defendant then choked her. J.J. feared for her life. She passed out and when she regained consciousness, she was nude. J.J. tried to leave but defendant grabbed her. It took six or seven tries to get outside. She did not give defendant permission to remove her clothing. At one point, defendant had her against a wall, touched her breast and asked if she wanted to go "upstairs and f***." After the police arrived, J.J. was shown photographs defendant took of her while she was passed out and nude. She did not give him permission to take the photographs or know what happened when she was unconscious.

¶ 30    T.B. read a victim impact statement stating that defendant took away a "happy-go-lucky girl" and created a nightmare from which she will "never ever be able to break free." It was "absolute hell" reporting the assault and as a result of it, T.B. sought counseling, took medication for anxiety, and has a "dirty, weird feeling" whenever she thinks about sex.

¶ 31    In mitigation, the defense presented defendant's mother, Citchell Holiday, who testified that defendant suffered a traumatic brain injury in the military. This injury causes headaches and memory loss. Defendant also suffered from a sleep disorder, anxiety, and PTSD.

¶ 32    On December 29, 2013, defendant was having a breakdown because he had not received his medication due to the restrictions of electronic monitoring and she wanted him taken to a hospital. Defendant also self-medicated with alcohol. When defendant was compliant with his

medication, he was a "jokester." Holiday described defendant as her "rock," who was protective of his family, cared for Holiday and his mentally challenged brother, helped other veterans, and was an "excellent" father to his 21-year old daughter.[6]

¶ 33    During cross-examination, Holiday denied calling police on December 29, 2013, because defendant was violent and intoxicated, and denied that defendant was handcuffed. She did not know whether her husband called 911 that day. She denied calling the police on September 21, 2008, because defendant was intoxicated; rather, he had a breakdown. Although Holiday admitted that defendant was in a fight where he was beaten by other service members, she stated that according to the "federal government," that incident "was not to be discussed."

¶ 34    In conclusion, the State argued that defendant was a man who preyed on drunk women. The defense argued that defendant had limited criminal history, suffered from mental illness, and was "severely" disabled while on active duty.

¶ 35    In sentencing defendant, the trial court stated it considered, in pertinent part, the testimony at the sentencing hearing and the facts of the case. The court also was "mindful" of the statutory factors in aggravation and mitigation and concluded that none of the statutory factors in mitigation applied. However, other factors in mitigation were present, including that defendant served as a Marine and worked after his injury. In aggravation, the court noted defendant's criminal history and the 2011 incident which had "striking similarities" to the instant case. The court merged the eight aggravated criminal sexual assault counts into two counts, and sentenced defendant to two consecutive 20-year prison terms.

---

[6] Holiday later testified that although defendant had brothers, he was her "only son."

¶ 36    Defendant filed a motion to reconsider sentence. At the hearing on the motion, counsel argued that the trial court's determination that no statutory mitigating factors applied was erroneous. Counsel further argued the court could consider the "excessive harshness" imprisonment would have on defendant's dependents, defendant's law-abiding life prior to the offense, and the impact a lengthy prison sentence would have on defendant due to his medical ailments.

¶ 37    In denying the motion, the trial court stated it could have been "clearer" that it did not find "applicable" the mitigating factors of excessive hardship to dependents or that imprisonment would endanger defendant because no evidence supported those factors. However, the court noted that its comments at sentencing acknowledged defendant's mother's testimony and his military service.

¶ 38    On appeal, defendant first contends that the State improperly sought to shift the burden of proof during rebuttal argument by stating that defendant could not "merely" argue that T.B.'s testimony was unreliable, but had to prove it. The State contends that defendant forfeited this issue on appeal because he failed to include the issue in a post-trial motion. Defendant, however, notes that trial counsel timely objected to this statement and argues that because the error is constitutional in nature, it is not subject to forfeiture. Defendant further argues that in the event this issue was not properly preserved, this court may review it pursuant to the plain error doctrine.

¶ 39    We first consider the plain error doctrine, which permits this court to review a forfeited error when "a clear or obvious error occurred" and "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or "that error is so serious that it affected the fairness of the defendant's trial and

challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48. First-prong plain error is established when a defendant demonstrates prejudicial error. *Id.* ¶ 51. Prejudice is not presumed; rather, a defendant must meet his burden to show the error, in and of itself, "severely threatened to tip the scales of justice against him." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). By contrast, under the second prong, prejudice is presumed because of the importance of the right involved regardless of the closeness of the evidence. *People v. Fort*, 2017 IL 118966, ¶ 18.

¶ 40 Here, defendant claims error under both prongs. The first step in any plain error analysis is to determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49. Absent error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18.

¶ 41 The State bears the burden of proof at trial (*People v. Murray*, 2019 IL 123289, ¶ 28), and may not shift that burden to a defendant during closing argument (*People v. Phillips*, 127 Ill. 2d 499, 527 (1989)). However, the State "has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). The State "may not argue assumptions or facts not contained in the record" or shift the burden of proof by suggesting the defendant was obligated to present evidence of his innocence at trial. *Id.* at 204, 212. However, during closing argument, the State may properly (1) comment on facts presented in evidence or upon reasonable inferences drawn from that evidence, (2) respond to comments made by defense counsel which clearly invite response, and (3) comment on the credibility of witnesses. *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 57.

¶ 42    When reviewing the State's closing argument for error, we must consider the argument "in its entirety, and the challenged remarks must be viewed in their context." *Glasper*, 234 Ill. 2d at 204.  The State's challenged remarks must therefore be viewed against the entire record, including "the full argument" of both sides. *People v. Williams*, 313 Ill. App. 3d 849, 863 (2000). The State's comments during closing argument "will not be held improper if they were provoked or invited by the defense counsel's argument." *Glasper*, 234 Ill. 2d at 204. In other words, the State is permitted to respond to comments made by the defense. *Cosmano*, 2011 IL App (1st) 101196, ¶ 57. When reviewing the State's comments, this court must determine whether "the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 43    In *People v. Jackson*, 2020 IL 124112, ¶ 83, our supreme court explained that "[t]he standard of review applied to a prosecutor's closing argument is similar to the standard used in deciding whether a prosecutor committed plain error." Thus, "[a] reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Id*.

¶ 44    The defense placed T.B.'s credibility at issue throughout the trial, including during its cross-examination of T.B. and the police officers to whom she spoke. In particular, the defense focused on inconsistencies in her statements and alleged discrepancies between her testimony and the photographs of herself and her apartment taken immediately following the incident. During closing argument, trial counsel argued that T.B.'s version of events changed and was therefore unbelievable. Accordingly, in rebuttal, the State could comment on T.B.'s credibility, including her lack of motivation to lie and the fact that the retelling of the "same story over and over again"

resulted in different people being told different details. Viewed in context, the State's complained-of remark directly responded to defendant's argument that there was difficulty in "combat[ing] a statement from its inception meant to deceive, otherwise known as a lie." In other words, although the defense theory of the case was that T.B. was lying, the State noted that there was no proof that she lied.

¶ 45    The State may comment on the credibility of witnesses and the comment here did not impermissibly shift the burden of proof. See *Phillips*, 127 Ill. 2d at 527 ("Not every prosecutorial statement questioning relevance or credibility rises to an impermissible shifting of the burden."). The defense relied upon the alleged inconsistencies in T.B.'s recitation of events to conclude that she was lying. The State responded that that it was easy to accuse T.B. of lying without proving it. Therefore, as this remark directly responded to trial counsel's insinuation that T.B. was lying, it was not improper. See *Cosmano*, 2011 IL App (1st) 101196, ¶ 57 (the State may "respond to comments made by defense counsel which clearly invite response"); see also *People v. Chaban*, 2013 IL App (1st) 112588, ¶ 63 (in closing arguments, the State may challenge the defense's characterizations of the evidence and comment on the persuasiveness of the defense).

¶ 46    Ultimately, after reviewing the record in its entirety, we conclude that the State's remark during rebuttal was not improper where it was invited by the defense's closing argument that there was no way to combat a lie. The State's response did not shift the burden of proof; rather, it noted that no evidence supported defendant's argument that T.B. was lying. See *Glasper*, 234 Ill. 2d at 212 (finding the State did not shift the burden of proof by asking " '[w]here's the evidence of that' " in response to defense counsel's unsubstantiated claim of a coerced confession); see also *People v. Kliner*, 185 Ill. 2d 81, 155 (1998) (the State's "comments during rebuttal argument

regarding defense counsel's ability to subpoena [a witness] were invited by defense counsel's argument that the State failed to call [that person] as a witness").

¶ 47    Therefore, as defendant has failed to establish error, he cannot establish plain error and his procedural default of this issue must be honored. As there was no error, defendant similarly cannot establish that he was deprived of a constitutional right.

¶ 48    Defendant next contends that his 40-year sentence is excessive when the trial court failed to consider certain statutory factors in mitigation. He argues that he had no criminal history prior to this incident and suffered a brain injury while serving in the military. Defendant further contends the trial court failed to give adequate weight in mitigation to the fact defendant's service-related injury led to his alcoholism which in turn led to his criminal behavior.

¶ 49    Initially, we note that defendant was not sentenced to 40 years in prison; rather, he was sentenced to two consecutive 20-year prison terms, one for each count of aggravated criminal sexual abuse of which he was found guilty. See 720 ILCS 5/12-14(a)(2), (3) (West 2004); 730 ILCS 5/5-8-4(a)(ii) (West 2004) (the court shall impose consecutive sentences if the defendant was convicted of a violation of, *inter alia*, section 12-14 of the Criminal Code of 1961). Our supreme court "has long held that consecutive sentences constitute separate sentences for each crime of which a defendant has been convicted." *People v. Carney*, 196 Ill. 2d 518, 529 (2001). Moreover, the court has previously held that "when consecutive sentences are imposed, they do not form a single sentence for any purpose other than determining the manner in which the sentences are to be served for the purpose of determining an offender's eligibility for parole." *Id*. at 530 (citing *Thomas v. Greer*, 143 Ill. 2d 271, 278-79 (1991)). Accordingly, "consecutive sentences do not constitute a single sentence and cannot be combined as though they were one

sentence for one offense. Each conviction results in a discrete sentence that must be treated individually." *Id.*

¶ 50    When determining a sentence, "the trial court has broad discretionary powers." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Substantial deference is given to the trial court because "the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. A reviewing court will therefore not alter a defendant's sentence absent an abuse of discretion by the trial court. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A trial court abuses its discretion in determining a sentence where the sentence is greatly at variance with the spirit and purpose of the law or if it is manifestly disproportionate to the nature of the offense. *Id.*

¶ 51    A trial court is not required to expressly outline its reasoning for a sentence, and absent some affirmative indication to the contrary, other than the sentence itself, a reviewing court presumes that the trial court considered all mitigating factors on the record. *People v. Perkins*, 408 Ill. App. 3d 752, 762-63 (2011); see also *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51 (absent evidence to the contrary, we presume that the sentencing court considered all mitigating evidence presented). A defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense (*People v. Reed*, 2018 IL App (1st) 160609, ¶ 62), and "the presence of mitigating factors requires neither a minimum sentence nor precludes a maximum sentence" (*People v. Jones*, 2014 IL App (1st) 120927, ¶ 55).

¶ 52    Here, defendant was found guilty of two counts of the Class X offense of aggravated criminal sexual assault. 720 ILCS 5/12-14(a)(2), (3), (d) (West 2004). The sentencing range for a

Class X felony is between 6 and 30 years in prison (730 ILCS 5/5-8-1(a)(3) (West 2004)). We cannot say that the 20-year sentence imposed on defendant for each count, which is just slightly above the middle of the applicable sentencing range, was an abuse of discretion when the court stated that it considered the factors in aggravation and mitigation prior to imposing sentence. *Alexander*, 239 Ill. 2d at 212-13.

¶ 53    Nonetheless, defendant contends that the trial court failed to consider in mitigation that he had no prior criminal record at the time of the instant offense or that a service-related brain injury was the "root cause" of his alcoholism and resulting criminal behavior.

¶ 54    The mere fact that the trial court did not afford the same weight to the evidence presented in mitigation as defendant thinks the court should have does not amount to an abuse of discretion, nor does it establish the court did not consider the mitigating factors. See *Perkins*, 408 Ill. App. 3d at 762-63 (a trial court is not required to expressly outline its reasoning for sentencing, and absent some affirmative indication to the contrary, other than the sentence itself, a reviewing court presumes that the trial court considered all mitigating factors on the record). Rather, it is presumed that the trial court properly considered all mitigating factors before it, as well as the defendant's rehabilitative potential, and the burden is on the defendant to affirmatively show the contrary. *People v. Brazziel*, 406 Ill. App. 3d 412, 434 (2010). Here, defendant cannot make such a showing, as the trial court specifically mentioned defendant's service as a Marine and that he worked after his injury. The court also noted that it was "mindful" of the statutory factors in aggravation and mitigation and considered defendant's criminal history and J.J.'s testimony which detailed an incident with "striking similarities" to the instant case. At the hearing on defendant's motion to reconsider, although trial counsel argued that the trial court erred when it determined that no

statutory mitigating factors applied, the court replied that it did not find certain factors "applicable" because no evidence supported them. Ultimately, defendant asks us to reweigh the evidence presented in mitigation and come to a different conclusion. However, it is not the function of a reviewing court to independently reweigh these factors and substitute its judgment for that of the trial court. *Alexander*, 239 Ill. 2d at 213.

¶ 55     To the extent that defendant argues that the trial court did not specifically note that he did not have a criminal history prior to the instant offense, the record reveals that the trial court stated that it considered his criminal history without specifying dates or offenses. The trial court was not required to recite every factor considered in aggravation and mitigation or the weight that it assigned to each. See *People v. Davis*, 93 Ill. 2d 155, 162-63 (1982) (holding that the trial court has "no independent duty" to provide reasons for a particular sentence). Accordingly, "we adhere to the 'well-established precedent' that a trial court is neither required to specify on the record the reasons for the sentence imposed, nor recite and assign value to each factor presented at the sentencing hearing." *People v. Brown*, 2018 IL App (1st) 160924, ¶ 18 (quoting *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 95).

¶ 56     For the forgoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 57     Affirmed.