NOTICE

Decision filed 08/08/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220495-U

NO. 5-22-0495

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 19-CF-1811 |
| | ) | |
| JERALD E. SANDAGE, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Presiding Justice McHaney and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We find the trial court erred in denying the defendant's motion to suppress evidence, where neither the good faith nor inevitable discovery exceptions to the warrant requirement apply, and the error was not harmless.

¶ 2    The defendant, Jerald Sandage, was convicted of seven counts of official misconduct (720 ILCS 5/33-3 (West 2016)) after a stipulated bench trial held on August 1, 2022. The defendant was sentenced to five years' incarceration in the Illinois Department of Corrections with one year of mandatory supervised release.

¶ 3    On direct appeal, the defendant challenges the trial court's denial of his motion to suppress evidence. At trial, the State presented images of search results on a police database where the searches had been undertaken for no identifiable official reason. The images, containing certain individual's personal information, were discovered as a result of two searches of a copy of the

1

defendant's cellphone data, after a search warrant had been obtained. The search warrant authorized a search for evidence of sexual assault.

¶ 4     The defendant argues that the evidence should have been suppressed by the trial court. Specifically, the defendant argues the search warrant lacked sufficient particularity, the images were not found in plain view during the first search, and the second search conducted was outside the scope of the search warrant. For the following reasons, we reverse the trial court's order on the defendant's motion to suppress and remand for a new trial.

¶ 5                                    I. BACKGROUND

¶ 6     On September 23, 2018, T.H. reported to the Champaign County Sheriff's Department that she had been sexually assaulted on September 21, 2018, by the defendant, Jerald E. Sandage, an officer with the University of Illinois Police Department (UIPD). Due to a potential conflict of interest based on the defendant's status as a UIPD officer, Agent Kyle Border of the Illinois State Police (ISP) was assigned to investigate the allegations. The victim, T.H., reported that she was communicating with the defendant primarily using a software program called Snapchat.

¶ 7     A hearing was held on the defendant's motion to suppress evidence on January 4, 2021, at which testimony was given by Agent Border and Lieutenant McCullough. Agent Border described Snapchat as a social media application that can be used to communicate between parties, and his understanding of the program was that messages would disappear if they were not captured via a screenshot. T.H. had relayed during the investigation that she met the defendant at a concert on September 19, 2018. They began to communicate via Snapchat, and on September 20, 2018, they went to a local bar to see a band together. The defendant bought T.H. several drinks and they went back to the defendant's home where he made T.H. another drink. T.H. reported that the defendant sexually assaulted her twice that evening.

2

¶ 8　　Based on information gathered from T.H., on September 23, 2018, the ISP obtained a warrant to seize and search "cellular telephones and other electronic devices," owned by the defendant which had been used in the "commission of, or which constitute evidence of, the offense of Criminal Sexual Assault." The warrant specifically authorized "the search of such electronic devices as are seized under its authority." Pursuant to the search warrant, ISP searched the defendant's house on September 23, 2018, and seized the defendant's iPhone and iPad, but left behind a laptop computer.

¶ 9　　Agent Border created a digital copy of the contents of the defendant's cellular telephone (cellphone) using a program called Cellebrite and searched its contents. He explained that the program opens the data downloaded from the defendant's cellphone in a file called the Cellebrite analyzer. Agent Border searched the photographs contained in the defendant's cellphone data. He described tabs that appear when opening the Cellebrite analyzer, and how thumbnails would appear upon opening the Cellebrite file. Initially, he explained, all thumbnails appear on the screen, and the photographs can be narrowed by search criteria from that point. Search criteria included date, times, specific key words, or individuals. Agent Border did not believe that the thumbnail images could be narrowed prior to the initial screen loading. It was not adduced during the hearing how many images initially appear on the screen or whether images found by Agent Border were displayed on the initial screen that loads upon opening or found elsewhere during his search.

¶ 10　　Agent Border saw images appearing to capture search results from UIPD's police system that they would use to check people's information. He stated, "I think their system is called ARMS—ours would be LEADS." ARMS stands for Automated Records Management System (ARMS), and LEADS stands for Law Enforcement Agencies Data System (LEADS). Both ARMS and LEADS are police databases that are exclusive to law enforcement and to be used only for

3

official purposes. Agent Border was aware that using the ARMS system for personal information was "a violation"; however, upon viewing the images he did not have any information to suggest that the ARMS searches depicted in the images were used for personal or professional reasons. Agent Border also saw photographs of naked women that he thought "seemed off."

¶ 11    Agent Border drafted a report and presented the same to the prosecutor assigned to the case. On September 11, 2019, the prosecutor declined to file charges for criminal sexual assault against the defendant for his conduct related to T.H. Shortly after the initial declination, another individual came forward with sexual assault allegations against the defendant. Agent Border discussed the additional information with the prosecutor, who maintained the decision to decline charges. At that point, Agent Border determined that his investigation had concluded and sought to provide the evidence gathered along with his report to UIPD.

¶ 12    UIPD Lieutenant Joseph McCullough was tasked with conducting an internal employment investigation into the defendant for potential police procedural and policy violations stemming from the ISP investigation. He received a report from ISP on September 29, 2019, which he reviewed. He also interviewed the defendant on October 3, 2019, with his attorney present, as part of the internal investigation. On October 8, 2019, Agent Border discussed his concerns with Lieutenant McCullough about photographs contained within the defendant's cellphone data. Lieutenant McCullough recalled that Agent Border had concerns about images of a woman, but did not mention any misuse of the ARMS or LEADS databases.

¶ 13    On October 9, 2019, Agent Border placed a copy of the defendant's cellphone data on a hard drive which Lieutenant Mccullough ultimately downloaded onto a UIPD computer. Lieutenant McCullough eventually reviewed the digital copy of the contents of the defendant's cellphone data without permission from the defendant and without seeking a new warrant.

4

Lieutenant McCullough explained that he was looking at the defendant's cellphone data for employment purposes, not as part of a criminal investigation. He decided to look at the photographs of a second potential victim of sexual assault that Agent Border had showed him. When asked why, Lieutenant Mccullough testified that it was part of his investigation, and he had told the defendant, "I'm gonna go look at any piece of evidence that we may have for policy violations."

¶ 14    In looking through the photographs contained on the defendant's cellphone, of which there were over a quarter of a million, Lieutenant McCullough began to see images of search queries conducted in the ARMS and LEADS databases. Based on his review of the ARMS and LEADS images, Lieutenant McCullough was suspicious that the defendant may have engaged in improper use of those databases. At that point, Lieutenant McCullough thought he may need a search warrant to continue searching the defendant's cellphone data, and he called the state's attorney's office. He spoke with a prosecutor who indicated that he did not need to obtain a search warrant to continue searching the hard drive. After further investigation, Lieutenant McCullough concluded that the LEADS searches were not performed in connection with the defendant's official duties.

¶ 15    On December 23, 2019, the defendant was charged with seven counts of official misconduct, in violation of section 33-3 of the Criminal Code of 2012 (720 ILCS 5/33-3 (West 2016)), a Class 3 felony. Each count alleged that the defendant, a "public employee, while acting in his official capacity as a police officer with the University of Illinois Police Department, with the intent to obtain a personal advantage for himself, performed and acted in excess of his lawful authority in that he used LEADS for information on [an individual] for no identifiable official reason." The offenses occurred between February 25, 2017, and January 30, 2018.

¶ 16    The defendant moved to suppress the LEADS and ARMS images discovered in his cellphone data. He argued that the ISP's search warrant lacked particularity where it authorized the search and seizure of any electronic device because the probable cause established in the warrant stemmed exclusively from the smart phone application, Snapchat. Additionally, the defendant argued that Lieutenant McCullough conducted a warrantless search of the digital copy of the defendant's cellphone, that said search was illegal and exceeded the scope of the original warrant.

¶ 17    The State responded that the warrant was particularized because it was limited to devices "which constitute evidence of Criminal Sexual Assault." The State noted that the officers that conducted the search exercised discretion because they did not seize every electronic device that was located. The State also argued that Lieutenant McCullough did not conduct a search of the defendant's cellphone, rather "he simply reviewed information that was already recovered by Agent Border pursuant to a valid search." The State analogized that the same principle would apply if Agent Border would have recovered bedding from the defendant's residence and if Lieutenant McCullough had then later examined the bedding. Additionally, the State argued that pursuant to the then recent decision in *People v. McCavitt*, 2021 IL 125550, the defendant had a lowered expectation of privacy because there was an ongoing investigation with evidence obtained by a valid warrant and that there was still an active search warrant for the offense of criminal sexual assault.

¶ 18    A suppression hearing was held on January 4, 2021. In denying the defendant's motion to suppress the LEADS images, the trial court held in pertinent part that: (1) the warrant was sufficiently particularized as to empower officers to distinguish between electronics used in furtherance of or containing evidence of a sexual assault and electronics not necessary or included

within the defendant's home; (2) Agent Border's search of the cellphone data was within the scope of the warrant as it was directed at the investigation of sexual assault, and additional evidence of a possible second sexual assault victim; and, (3) the LEADS images were found by Agent Border pursuant to the plain view exception to the warrant requirement.

¶ 19    As such, the trial court found that neither search of the defendant's cellphone violated the defendant's fourth amendment rights because Agent Border's search was within the scope of the original search warrant and reasonably directed at uncovering evidence of criminal sexual assault in furtherance of an active investigation, as opposed to a criminal proceeding that has been terminated, upon which charges had yet to be brought. The trial court found that while the good-faith exception did not apply to Lieutenant McCullough's search of the cellphone data, "the use of the plain-view doctrine is sufficient under the first search warrant issued as an adequate showing of a lawful right of access on the part of the State."

¶ 20    The parties then proceeded to a stipulated bench trial on August 1, 2022, where they agreed that if the case were to go to trial, the State would present the following evidence:

1. On September 23, 2018, T.H. reported to the Champaign County Sheriff's Office that she had been sexually assaulted by the defendant a few days earlier, and as a result, the ISP conducted an investigation.

2. ISP Agent Border applied for and obtained a search warrant to seize and search the defendant's iPhone and iPad for evidence of the sexual assault.

3. Another investigation of the defendant's digital data was conducted by UIPD Lieutenant McCullough, during which he saw photographs and images saved in the devices that appeared to be information displayed on the screen from LEADS and ARMS, both police databases which are restricted and can only be used for law enforcement purposes.

7

4. Specifically, Lieutenant McCullough saw images of LEADS and ARMS search results regarding seven different individuals, as well as pictures on the defendant's cellphone of these individuals. Each image of a LEADS search of an individual or their license plate formed the basis of the seven different counts of official misconduct.

5. As to each of these individuals, Lieutenant McCullough "found no evidence that the searches were made for an official or work-related reason."

6. The defendant admitted that the State's witnesses would testify substantially as set forth above.

¶ 21 The trial court found the defendant guilty on all counts and sentenced him to seven concurrent terms of five years' incarceration in the Illinois Department of Corrections. The defendant promptly filed a notice of appeal on August 1, 2022.

¶ 22                                    II. ANALYSIS

¶ 23 On appeal, the defendant challenges the trial court's ruling denying his November 17, 2020, motion to suppress evidence. The defendant cites three reasons the evidence should have been suppressed: (1) the warrant to search the defendant's home was not sufficiently particularized; (2) the searches of the defendant's cellphone data exceeded the scope of the warrant; and (3) the LEADS and ARMS images were not found in plain view during Agent Border or Lieutenant McCullough's searches.

¶ 24                      A. Particularity of the Search Warrant

¶ 25 The defendant first argues that the trial court erred when it denied his motion to suppress evidence because the search warrant issued in this case was invalid on its face. The defendant argues the search warrant was invalid where it failed to describe its target with sufficient particularity. In support, the defendant states that the search warrant was overbroad where it

8

authorized the seizure of "cellular telephones and other electronic devices," and "authorize[d] the search of such electronic devices as are seized under its authority." Further, he argues that the search warrant was overly broad where it authorized a search of the defendant's cellphone for evidence that had been "used in the commission of, or which constituted evidence of, the offense of Criminal Sexual Assault." The defendant argues a more specific alternative would have protected the defendant's privacy while still permitting a legitimate investigation. The State argues that the defendant forfeited this particularity issue by failing to raise it in the trial court, that there is no plain error, and that the searches "did not exceed the parameters of the warrant which was sufficiently particular."

¶ 26                                    1. *Forfeiture*

¶ 27    The State argues that the fact the defendant's failure to argue the same basis for suppression in the trial court and on appeal results in forfeiture of the argument made on appeal. The defendant filed a motion to suppress evidence in the trial court, alleging that the search warrant was overbroad where it did not properly inform police which electronic devices could be properly seized from the defendant's home. The defendant alleged that there was no probable cause to seize the defendant's iPad. While the defendant generally placed the validity of the search warrant at issue during the suppression hearing before the trial court, he never argued that more specific limitations on the search of the data extracted from his cellphone should have been contained in the warrant. The defendant argues the warrant should have included limitations for date and locations within the cellphone data for the first time on appeal. The defendant urges that where law enforcement knew that the defendant communicated with T.H. via Snapchat messages and knew the specific dates of the encounters between the two, the search should have been limited to text messages within the

9

Snapchat application and the date range from the time of the first communication between the defendant and T.H.

¶ 28    The defendant acknowledges that his arguments before the trial court were distinct from those on appeal but has argued that he need not state identical grounds for contesting the issue of particularity with regard to the search warrant, citing *People v. Wise*, 2019 IL App (2d) 160611. In *Wise*, the defendant argued a search warrant lacked probable cause where a witness lacked reliability. *Id.* ¶ 45. On appeal, the defendant presented the related argument that the witness was unreliable because he failed to testify before the issuing judge. *Id.* ¶ 46. The appellate court held that the witness's failure to testify would have shed light on the witness's background and credibility, and thus, the defendant was not introducing a novel argument on appeal by pointing out the relevance of whether the witness testified before the issuing judge. *Id.*

¶ 29    The argument made before the trial court in the present case was not similarly related to the argument on appeal. We find the case of *People v. Hughes*, 2015 IL 117242, ¶ 45, instructive. In *Hughes*, our supreme court found that where a defendant raised arguments on appeal that were almost entirely distinct from the arguments he raised before the trial court, the defendant did not adequately preserve his claims for review. *Id.* There, the defendant argued his confession was involuntary and should have been suppressed for reasons that were different than what he argued before the trial court. *Id.* ¶ 25. The supreme court reversed the appellate court and concluded that the trial court did not err when it denied the defendant's motion to suppress. *Id.* ¶ 47. The supreme court held that "[b]y declining or failing to raise these claims below, defendant deprived the State of the opportunity to challenge them with evidence of its own, he deprived the trial court of the opportunity to decide the issue on those bases, and he deprived the appellate court of an adequate record to make these determinations." *Id.* ¶ 46.

10

¶ 30    Here, the defendant's claims were not litigated before the trial court and the State never had the opportunity to present any evidence or arguments to challenge the claims. Had the issues been raised below, the State could have elicited further testimony from Agent Border regarding what limiting information was known to him when seeking the warrant and how that knowledge could or could not have been utilized within the Cellebrite system to limit the data accessed during the search. He also could have testified about the need to search additional locations and date ranges and why he believed they would contain evidence of sexual assault. The trial court was similarly deprived of the opportunity to rule on these issues, and thus, made no findings of fact for this court to review relating to the same.

¶ 31    Whether a search warrant is sufficiently particular depends on the facts and surrounding circumstances. *People v. Simmons*, 210 Ill. App. 3d 692, 697 (1991). As there was no ruling on this issue below, there is no error for this court to review. *People v. Pleasant*, 2017 IL App (1st) 143780-U, ¶ 39. Therefore, we conclude the defendant did not preserve these claims for appeal and they are forfeited.

¶ 32                                            2. *Plain Error*

¶ 33    The defendant argues that this court may reach the issue raised for the first time on appeal pursuant to the second prong of the plain error doctrine. Under the second prong of the plain error rule, the defendant must prove that there was plain error and that "the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Second prong plain error review has been equated to structural error. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). "Structural errors have been recognized in only a limited class of cases including: a complete denial of counsel; trial before a biased judge; racial discrimination in the selection of a grand jury; denial of self-representation at

11

trial; denial of a public trial; and a defective reasonable doubt instruction." *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 78.

¶ 34    The defendant relies on *People v. Surles*, 2011 IL App (1st) 100068, ¶ 18, for the proposition that where the defendant failed to properly preserve an issue of his substantial constitutional rights for review, plain error analysis is applicable. *Id.* While the court in *Surles* applied second prong plain error review to the denial of a motion to suppress, the authority cited, *Starnes*, was a case implicating the defendant's right to counsel, a right clearly recognized as structural error. *People v. Starnes*, 273 Ill. App. 3d 476, 481 (1995).

¶ 35    The admission of illegally obtained evidence in a criminal trial following the erroneous denial of a motion to suppress evidence is subject to the harmless error rule. *People v. Mueller*, 2021 IL App (2d) 190868, ¶ 55. Structural error, however, is not subject to harmless error review. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006). As such, we would not find the defendant's argument here subject to second prong plain error review. Even if we were to find second prong plain error review applied, we find no error here.

¶ 36    The fourth amendment requires a warrant to particularly describe both the place to be searched and the persons or things to be seized. *United States v. Grubbs*, 547 U.S. 90, 97(2006). A facially deficient warrant fails to particularize the place to be searched or the things to be seized to the extent that the executing officers cannot reasonably presume it to be valid. *People v. Manzo*, 2018 IL 122761, ¶ 64. The purpose of the particularity requirement is to guard against broad exploratory searches and to ensure the scope of a search is narrowly tailored. *People v. Bui*, 381 Ill. App. 3d 397, 410 (2008). Courts must determine whether warrants meet the requisite specificity on a case-by-case basis by considering what degree of descriptive detail is reasonable given the

12

nature of the property to be seized and the progress of the police investigation at the time the warrant was issued. *Id.*

¶ 37 This court has cited as persuasive *People v. Bishop*, 910 F.3d 335 (7th Cir. 2018), which we commented was dispositive of a similar particularity claim. See *People v. Weis*, 2022 IL App (5th) 210076-U, ¶ 61. *Bishop* held that a search warrant authorizing officials to search the defendant's cellphone and to seize " 'any evidence (including all photos, videos, and/or any other digital files, including removeable memory cards) of suspect identity, motive, scheme/plan along with DNA evidence of the crime of Criminal Recklessness with a deadly weapon *** [in the cellphone or] related to the offense of Dealing illegal drugs was permissible.' " *Bishop*, 910 F.3d at 336. The court ruled the warrant was not too general for fourth amendment specificity purposes simply because it allowed the police to look at every file on the defendant's cellphone and decide which files satisfied the description. *Id.* The court reasoned that "specificity is a relative matter," and that a warrant will be found to be too general only in cases where "some more-specific alternative would have done better at protecting privacy while still permitting legitimate investigation." *Id.* at 337. The court added that "a warrant need not be more specific than knowledge allows," and that as long as a warrant is as specific as the known facts and circumstances allow, "[t]he Constitution does not require more." *Id.* at 338.

¶ 38 In this case, the defendant argued Agent Border could have limited the warrant based on his knowledge of the dates the defendant and victim were in communication and that the text function of Snapchat was their primary form of communication. The language in the warrant and affidavit, however, does not definitively bely those facts. The defendant argues that Agent Border knew the type of evidence sought from the defendant's cellphone, including "the victim's description of their conversations, locations, meetings, and nature of their relationship," as well as

13

the two using their cellphones and primarily using Snapchat to communicate, along with dates of their encounters. While the defendant concludes that Agent Border knew what particular information would be found in the defendant's cellphone consistent with this type of evidence, we cannot agree based on the record before us.

¶ 39    While Agent Border knew the defendant *primarily* communicated with the victim via Snapchat, that knowledge does not indicate they *always* communicated via Snapchat. As the trial court found, messaging does not mean only text messaging, especially on a platform such as Snapchat, which utilizes photographs and videos in its messaging platform. Here, T.H. showed Agent Border a screenshot of a message between the defendant and herself, which would be an image stored in her cellphone data. It is clear, then, that the trial court's finding that photographs would be a reasonable area to search for evidence of sexual assault was not against the manifest weight of the evidence.

¶ 40    Whether the search should have been limited to certain dates and what those dates should have been is unclear. Because this issue was not litigated below, there is no evidence before this court that Agent Border could have used the information at his disposal to limit his search of the cellphone data. Agent Border explained that when opening the photographs file on the Cellebrite analyzer, there is no way to limit the search parameters of photographs by date before thumbnails are displayed, although they could be limited by date thereafter. A date range parameter, however, was not considered by the trial court below. What is reasonable is fact specific.

¶ 41    While the defendant argues the search should have been limited by the date range encompassed by the time the defendant and T.H. first met to the report of sexual assault, legitimate investigation would include evidence that may exist in a defendant's cellphone prior to the date the defendant met the victim. This evidence could include, *inter alia*, evidence of *modus operandi*,

14

motive, intent, planning, or evidence of other victims which may be admissible pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2018)). Evidence such as internet search terms, photographs, screenshots, messages, videos, or location data relating to the allegations of sexual assault could have been, and in this case was, contained in the cellphone data prior to the date the defendant first communicated with the victim.

¶ 42 For the foregoing reasons, we find on this record, that the search warrant here was not too general for fourth amendment specificity purposes simply because it allowed the police to look at every file on the defendant's cellphone and decide which files satisfied the description. As the trial court did not err based on the record before it, there can be no plain error. See *People v. Sims*, 192 Ill. 2d 592, 621 (2000) ("Before invoking the plain error exception, *** 'it is appropriate to determine whether error occurred at all.' " (quoting *People v. Wade*, 131 Ill. 2d 370, 376 (1989))). Therefore, the procedural default of forfeiture applies, and the defendant has forfeited this issue on appeal.

¶ 43                                  B. Scope of the Warrant

¶ 44 Next, the defendant argues that both Agent Border and Lieutenant McCullough's searches of the defendant's cellphone data were conducted outside the scope of the search warrant, and that the incriminating images discovered were not found in plain view. The defendant argues, therefore, that the trial court erred in denying his motion to suppress evidence of the LEADS images which led to his conviction. Further, the defendant claims his convictions must be reversed outright, where the evidence against him was gathered in a search that violated his fourth amendment rights.

¶ 45 Both the fourth amendment of the United States Constitution and article I, section 6, of the Illinois Constitution of 1970 protect individuals from unreasonable searches and seizures. *People v. Bujari*, 2020 IL App (3d) 190028, ¶ 37 (citing U.S. Const., amend. IV; Ill. Const. 1970, art. I

15

§ 6). "The fundamental purpose of these provisions is to safeguard the privacy and security of individuals from invasions by governmental officials." *Id.* When a defendant files a motion to suppress evidence, that defendant bears the burden of proof with regard to the motion. See *People v. Woods*, 2019 IL App (5th) 180336, ¶ 27. If the defendant is able to make a *prima facie* showing that the evidence to which the defendant objects was obtained in an illegal search or seizure, the burden then shifts to the State to provide evidence to counter the *prima facie* case. *Id.* When reviewing a ruling on a motion to suppress, we are presented with mixed questions of fact and law. *Manzo*, 2018 IL 122761, ¶ 25. We will give deference to a trial court's findings of fact and will reverse those findings only if they are against the manifest weight of the evidence. *Id.* Where the factual findings are accepted, we will conduct a *de novo* review of whether suppression is warranted under those facts. *Id.*

¶ 46                                    1. *Agent Border's Search*

¶ 47    The defendant argues that the trial court erred in denying his motion to suppress. Specifically, the defendant argues Agent Border's search of the defendant's cellphone data was outside the scope of the warrant, and the LEADS and ARMS images did not meet the plain view exception to the warrant requirement. Additionally, the defendant argues that the LEADS and ARMS images were not in plain view, as their illicit nature was not immediately apparent. In support, the defendant points to Agent Border's admission on cross-examination that he had no information to suggest that the images were used for personal or professional reasons. Further, the defendant argues that Agent Border was not authorized to give Lieutenant McCullough a digital copy of the defendant's cellphone because the State had indicated a no charge decision on the sexual assault allegation underlying the search warrant.

16

¶ 48    Pursuant to the plain view doctrine, an officer may seize an item he observes in plain view without a warrant, so long as (1) the officer observes the item from a place where he has a lawful right to be, (2) the incriminating nature of the item is immediately apparent, and (3) he has a lawful right of access to that object. *People v. Jones*, 215 Ill. 2d 261, 271-72 (2005). In denying the defendant's motion to suppress evidence, the trial court found that the initial search by Agent Border was within the scope of the search warrant and reasonably directed at uncovering evidence of criminal sexual assault in furtherance of an active investigation upon which charges had yet to be brought. The trial court found that the LEADS images were found in plain view during Agent Border's search of the defendant's cellphone data where: (1) Agent Border was lawfully in a position from which to view the images and his subjective intent was to investigate sexual assault; (2) Agent Border saw images that appeared to be LEADS and other law enforcement database information which were known by Agent Border to be a policy violation and their discovery was incidental to the investigation of evidence related to criminal sexual assault; and, (3) the search of the data fell within the scope of the warrant and was reasonably directed at uncovering evidence of criminal sexual assault in furtherance of an active investigation. The trial court found that the incriminating character of images of possible additional sexual assault victims was immediately apparent, otherwise Agent Border would not have notified Lieutenant McCullough. The trial court held that fact satisfied the second element of the plain view exception.

¶ 49    The defendant disputes the trial court's findings of fact. First, the defendant argues that the record contradicts the trial court's finding that Agent Border knew the LEADS and ARMS images were a policy violation. The defendant argues that Agent Border's testimony that he was unaware of how the defendant used the information from the ARMS and LEADS searches, for personal or professional reasons, the latter of which would not be criminal, directly contradicted the trial

17

court's finding that the incriminating nature of the images was immediately apparent. The defendant then argues that because the LEADS and ARMS images did not meet the statutory requirements for the plain view exception to the warrant requirement, Agent Border was not authorized to provide a digital copy of the defendant's cellphone to Lieutenant McCullough. The defendant argues that providing the cellphone data to Lieutenant McCullough constituted a subsequent search that would require a search warrant or an exception to the warrant requirement.

¶ 50　We will first address an issue of fact, which in our view greatly effects the analysis in this matter. While we give deference to a trial court's findings of fact and will reverse those findings only if they are against the manifest weight of the evidence, the fact that Agent Border found the LEADS images at dispute in this case is clearly rebutted by the record. While testifying at the motion to suppress hearing, Agent Border explained that he informed Lieutenant McCullough, during a transfer of the defendant's cellphone data, that the cellphone data contained images that concerned him. Agent Border testified that "[t]here were—I think their system is called ARMS— ours would be LEADS—but photographs of the police system that [UIPD] would use to check into people's information." He testified that, "there were several photographs of that along with several naked photographs of women that appeared to be asleep or—and then some were awake, but just—just seemed off." Thereafter, Agent Border was asked about the photographs of the ARMS system he referred to and reiterated that the images he saw appeared to be after a search was conducted on ARMS. While Agent Border testified that he saw images of police database searches and mentioned that the ISP database would be called LEADS, he clarified that for UIPD the database would be called ARMS. Agent Border never testified to having seen any LEADS images, mentioning only viewing images of searches conducted on the ARMS system.

18

¶ 51    Each of the charges for which the defendant was convicted alleged official misconduct related to unauthorized searches of the LEADS system, not the ARMS system. The stipulated bench trial in this matter included evidence related only to Lieutenant McCullough's search of the cellphone data, which led to his discovery of the LEADS images that resulted in the defendant's convictions. Thus, the record on appeal does not support the finding that LEADS images were discovered in plain view during Agent Border's search. While we do not disagree with the trial court's application of the law in ultimately finding that Agent Border's search was within the scope of the search warrant and the subsequent images he found were admissible under the plain view doctrine, Agent Border did not find any LEADS images. As such, we turn to an analysis regarding Lieutenant McCullough's search.

¶ 52                    2. *Lieutenant McCullough's Search*

¶ 53    The validity of Lieutenant McCullough's search depends on whether it was within the scope of the search warrant. See *McCavitt*, 2021 IL 125550, ¶ 89. The defendant argues that Lieutenant McCullough's search of the cellphone data exceeded the scope of the warrant because it involved a search for evidence of different crimes committed against different victims. The State argues that the search was within the scope of the original search warrant and reasonably directed at uncovering evidence of criminal sexual assault in furtherance of an active investigation.

¶ 54    The search of cellphone data must be reasonably directed at uncovering evidence of the criminal activity alleged in the warrant and any search that is directed instead at finding evidence of other and unrelated criminal activity is beyond the scope of the warrant. *Id*. Lieutenant McCullough testified that he was directed by the chief of police of the UIPD to review Agent Border's report and search the cellphone data to determine if there were any policy violations, prior to the defendant returning to work as a police officer. Lieutenant McCullough testified that

19

there were over a quarter of a million photographs contained in the cellphone data. He began to see "our own employees, pictures of them not knowing they're being taken. I began to see hundreds of our in-house law enforcement database, photos of those screen grabs. And I started to see LEADS entries that were photographed." This led Lieutenant McCullough to believe there could be additional criminal activity, so he contacted the state's attorney's office and spoke with a prosecutor, who indicated that he did not need a search warrant to continue searching the cellphone data. Lieutenant McCullough continued to search the cellphone data.

¶ 55    In *People v. McCavitt*, 2021 IL 125550, the defendant, a Peoria police officer, was charged with aggravated criminal sexual assault based on images the police found during a search of his computer. The search of the defendant's computer was pursuant to a search warrant authorizing a search for digital images or other evidence of aggravated criminal sexual assault, unlawful restraint, or unauthorized video recording. *Id.* ¶ 14. In executing the search warrant in 2013, Detective Jeff Avery removed the hard drive from the defendant's computer and made an exact, unalterable digital copy of its contents using EnCase software. *Id.* ¶ 21. Detective Avery then returned the defendant's computer to the Illinois State Police. *Id.* After a jury trial, the defendant was acquitted of all charges and requested the return of his property. *Id.* ¶¶ 22-23.

¶ 56    In 2014, as part of an internal investigation, Detective James Feehan of the Peoria Police Department obtained a copy of the defendant's computer hard drive from Detective Avery and found apparent child pornography and video recordings of women using the bathroom in the defendant's home. *Id.* ¶ 25. The defendant was charged with unauthorized video recording based on images from Detective Feehan's search of the data file. *Id.* ¶ 29.

¶ 57    Detective Feehan obtained a new warrant to search the EnCase file for additional images of child pornography, which he uncovered. *Id.* ¶ 32. The defendant moved to suppress the images,

arguing that once he was acquitted of the 2013 charges, there were no charges pending at the time of the 2014 search to justify the same. *Id.* ¶ 33. The trial court denied the motion, and, after a jury trial, the defendant was found guilty of numerous charges based on Detective Feehan's search of the data file. *Id.* ¶ 43.

¶ 58    On direct appeal, the defendant argued, *inter alia*, that the 2014 search of his EnCase file eight months after the initial warrant was issued and following his acquittal of sexual assault charges violated the fourth amendment. *Id.* ¶ 44. The State responded that the defendant had no expectation of privacy in the data file because it had been lawfully seized. *Id.* ¶ 45. The appellate court held that, once seized, the defendant's expectation of privacy in the EnCase file was significantly diminished until his sexual assault acquittal, which triggered a statutory right to the return of his property and restored his expectation of privacy in the computer. *Id.* Ultimately, the majority held that Detective Feehan's search "without a warrant" violated the defendant's fourth amendment rights because, after the defendant's acquittal, the police retained data that did not fit within the scope of the 2013 warrant. *Id.*

¶ 59    The supreme court reversed the appellate court and affirmed the trial court, holding that Detective Feehan's 2014 search had not exceeded the scope of the 2013 warrant. Their reasoning indicated that because Detective Feehan was looking broadly for evidence of unauthorized video recording which was separately authorized in the originally issued warrant and was not settled by the defendant's acquittal; the child pornography was properly seized under the plain view doctrine. *Id.* ¶ 117.

¶ 60    The *McCavitt* court held that the determination of whether the police must obtain a new warrant before searching the same data for evidence of another crime turns on the interplay of four concepts: (1) a person's reasonable expectation of privacy in data on an electronic storage device

21

that is subject to search, (2) double jeopardy principles, (3) the fourth amendment's particularity requirement as applied to electronic storage devices, and (4) the plain view doctrine. *Id.* ¶ 4. The supreme court cited *People v. Hughes*, 958 N.W.2d 98 (Mich. 2020) (*en banc*), as persuasive authority, wherein the Michigan Supreme Court explained that a search of an electronic storage device pursuant to a warrant must be reasonably directed at obtaining evidence relevant to the criminal activity alleged in the warrant. *Id.* ¶ 5 (citing *Hughes*, 958 N.W.2d at 104). A search of digital data that is directed instead at uncovering evidence of criminal activity not identified in the warrant is effectively a warrantless search that violates the fourth amendment absent some exception to the warrant requirement. *Id.*

¶ 61　　Here, as in *McCavitt*, the warrant at issue diminished the defendant's reasonable expectation of privacy in the images and videos he stored on his cellphone. Unlike the defendant in *McCavitt*, the defendant here was not acquitted of the sexual assault that authorized the initial search warrant. An acquittal is not the same as no charge decision by a prosecutor, as the latter does not implicate double jeopardy principles. This is because a prosecutor's no charge decision may be changed at any time within the applicable statute of limitations. See *People v. Gill*, 379 Ill. App. 3d 1000, 1007 (2008) (discussing the State's freedom to refile charges dismissed without prejudice within the timeframe of the statute of limitations). As the defendant could have been charged at any time prior to the running of the statute of limitations, the defendant's expectation of privacy was not restored as to the sexual assault investigation.

¶ 62　　The issue here is whether the second search of the defendant's data file was reasonably directed at obtaining evidence of the sexual assault against T.H. as authorized by the original warrant. If so, and the LEADS images were found in plain view of the same, the defendant's fourth

22

amendment rights would not have been violated. If not, we must determine if the good-faith exception to the warrant requirement applies.

¶ 63    The *McCavitt* court endorsed the concurrence in *Hughes*, which held the officer's subjective intention in conducting the search should be considered as a potentially dispositive factor in determining whether the search of seized data was reasonably directed at finding evidence of the criminal activity identified in the warrant. *McCavitt*, 2021 IL 12550, ¶ 103. The *Hughes* court stated, "if the officer purposefully searches for evidence of a crime other than the one identified in the warrant, the search cannot be reasonably directed at uncovering evidence of the criminal activity alleged in the warrant." *Id.* (citing *Hughes*, 958 N.W.2d at 124-25).

¶ 64    Unlike *McCavitt*, where the warrant authorized police to search for evidence of both sexual assault and unauthorized video recording, the warrant in the present case authorized a search for evidence only of sexual assault. Lieutenant McCullough testified that he received the ISP report regarding the defendant and T.H. in September 2019. When the chief of police handed him the report, he indicated that Lieutenant McCullough was to make sure that all policies and procedures were followed before bringing the defendant back to work as a police officer. Lieutenant McCullough testified at the suppression hearing that he examined "all the contents in the hard drive that contained the information from [the defendant's] phone." Lieutenant McCullough clarified on cross-examination that he was asked to review reports and conduct an internal investigation "into the allegations that had occurred the year prior to make sure there were no policy violations in our department."

¶ 65    When Lieutenant McCullough retrieved the cellphone data from Agent Border, he told Lieutenant McCullough there was a second victim that alleged the defendant had sexually assaulted her, and there were photographs on Agent Border's screen that he believed corroborated

23

that victim's complaint. Lieutenant McCullough testified that he decided to look at those same pictures again during his search and also told the defendant, "I'm gonna go look at any piece of evidence that we may have for policy violations." When he was initially looking at the cellphone data, he testified that he was doing so for employment purposes. At some point, that "was added to." Lieutenant McCullough did not elaborate in what way or why the target of the search was added to. While searching through "over a quarter of a million photos," he began to see pictures of UIPD employees, hundreds of photographs of search results from the ARMS database, and LEADS entries that were photographed. Having determined that these images may constitute evidence of criminal activity, he called the state's attorney's office to consult an attorney there as to whether or not he needed a search warrant to continue his search. The attorney he spoke with advised that he did not.

¶ 66    Lieutenant McCullough was aware the original search warrant authorized a search of the defendant's cellphone data for evidence of a specific offense, the sexual assault of T.H. Searching the entire data file for evidence of "any piece of evidence that may indicate policy violations" ran far afield of the scope of the original warrant. As such, Lieutenant McCullough's search constituted a warrantless search.

¶ 67                                    C. Good-Faith Exception

¶ 68    The State argues that, even if the search was conducted in violation of the warrant requirement, the good-faith exception to the exclusionary rule applies. The State argues Lieutenant McCullough reasonably relied on the original search warrant and a prosecutor's advice that obtaining a second warrant to search the digital data was not necessary.

¶ 69    The good-faith exception prevents suppression of evidence obtained by an officer acting in good faith and in reliance on a search warrant that was ultimately found to be without probable

24

cause where the warrant was "obtained from a neutral and detached judge, which warrant is free from obvious defects other than non-deliberate errors in preparation and contains no material misrepresentation by any agent of the State, and the officer reasonably believed the warrant to be valid." 725 ILCS 5/114-12(b)(1), (b)(2) (West 2018).

¶ 70   Once the defendant has shown a fourth amendment violation, it is the State's burden to prove that the good-faith exception applies. *People v. Turnage*, 162 Ill. 2d 299, 313 (1994). We review this question of law *de novo*. *Manzo*, 2018 IL 122761, ¶ 67. Because there is no constitutional right to the suppression of illegally obtained evidence, the judicially created exclusionary rule is to be applied only where its benefits outweigh its social costs. *Davis v. United States*, 564 U.S. 229, 236-37 (2011). The sole objective of exclusion is to deter future fourth amendment violations. *Id.* Thus, the exclusionary rule applies only when the conduct of the police, in violating the defendant's fourth amendment rights, was sufficiently deliberate that deterrence may be effective and sufficiently culpable that deterrence will outweigh the substantial social costs of excluding reliable, probative evidence of guilty. *People v. LeFlore*, 2015 IL 116799, ¶ 24. (citing *Herring v. United States*, 555 U.S. 135, 144 (2009)).

¶ 71   When the police act with an objectively reasonable, good-faith belief that their conduct was lawful, there is no illicit conduct to deter. *Id*. Because the analysis is objective, it is not an inquiry into the subjective awareness of the officers. *Id.* ¶ 25. Rather, we ask the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances. *Id.*

¶ 72   Here, the State relies on *People v. Weis*, 2022 IL App (5th) 210076-U, as persuasive authority. In *Weis*, this court held that the police did not act in bad faith in conducting a "second search" of the defendant's cellphone data after the trial court held the search was based on "an

25

objectively reasonable reliance on a search warrant previously secured for the defendant's cellphone. *Id.* ¶ 57. In *Weis*, however, this court found that the police were searching for "exactly the same thing" as the first look at the defendant's cellphone, evidence of criminal sexual assault. We have made the opposite finding here, as Lieutenant McCullough testified that he was searching for "any piece of evidence that we may have for policy violations."

¶ 73 While Lieutenant McCullough stopped his search and consulted with a prosecutor regarding the need for an additional warrant to continue his search, the prosecutor erroneously determined that a second search warrant was not necessary. Police may reasonably rely on a warrant obtained from a neutral and detached judge. 725 ILCS 5/114-12(b)(2)(i) (West 2018). Prosecutors and policemen, however, cannot be asked to maintain the requisite neutrality with regard to their own investigations. *Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971). Unlike a judge, the prosecutor is not a neutral and detached decision-maker but rather is part of the law enforcement team. As such, reliance on the advice of a prosecutor would not satisfy the good-faith exception to the warrant requirement. See 725 ILCS 5/114-12(b)(2)(i) (West 2018).

¶ 74 Further, any well-trained officer would know that the warrant authorized a search for evidence of a specific offense. Lieutenant McCullough could not have reasonably believed, even given the erroneous advice provided by the prosecutor, that the warrant authorizing a search for evidence of sexual assault allowed him to search any area of the defendant's cellphone for any violation of police policy or procedure or any crime. Nevertheless, he proceeded with his search of the defendant's cellphone data as if he had open access to all of the defendant's personal information whenever he wanted for any evidence of criminal activity or police procedural or policy violations based on the original search warrant. Thus, we find that the good-faith exception does not apply here.

26

¶ 75                          D. Inevitable Discovery

¶ 76    The State also argues that the LEADS images were admissible under the inevitable discovery exception to the exclusionary rule. In support, the State argues that Lieutenant McCullough, as the defendant's supervisor, had a right to review the digital download of the defendant's cellphone data in that capacity. However, the State cites no binding authority for such a proposition, nor any factually consistent persuasive authority. Further, the State fails to cite any evidence in the record that would tend to show that the defendant's supervisors had a right to review the defendant's personal digital data absent a valid search warrant. Thus, we find no merit to this argument.

¶ 77    The State argues, alternatively, that because Lieutenant McCullough had probable cause to obtain a warrant to search the defendant's cellphone data for policy concerns relating to the allegations the defendant had sexually assaulted at least two women, a warrant would have been granted if one had been sought. This argument, however, does not excuse the requirement that the officer actually obtain a search warrant. To allow such a rule would place police action beyond judicial review and emasculate the warrant requirement. *People v. Carter*, 2016 IL App (3d) 140958, ¶ 33.

¶ 78                          E. Harmless Error

¶ 79    A review of the denial of a motion to suppress illegally obtained evidence in a criminal trial is subject to the harmless error principle. *People v. Hansen*, 90 Ill. App. 3d 407, 408-09 (1980). The test is whether the error was harmless beyond a reasonable doubt. *Id.* at 409. The focus of this inquiry "should be on the character and quality of the illegally obtained evidence as it relates to other evidence on the same issue, and the possible impact of the tainted evidence on the jury." *Id.* On review, we may find an error is harmless when "the improperly admitted evidence is merely

27

cumulative or duplicates properly admitted evidence." *People v. Becker*, 239 Ill. 2d 215, 240 (2010).

¶ 80 Here, where the parties proceeded by stipulated bench trial, the only evidence provided to support the charges of official misconduct was the LEADS images discovered by Lieutenant McCullough during his search of the defendant's cellphone data. As such, we cannot find that the admission of such evidence was harmless beyond a reasonable doubt.

¶ 81 F. Double Jeopardy

¶ 82 Finally, we must determine whether retrial is precluded. "The double jeopardy clause does not preclude retrial when a conviction has been overturned because of an error in the trial proceedings, but retrial is barred if the evidence introduced at the initial trial was insufficient to sustain the conviction." *People v. Drake*, 2019 IL 123734, ¶ 20. Generally, a retrial would be appropriate if the evidence presented at trial, including any improperly admitted evidence, was sufficient to sustain the conviction. *Id.* ¶ 21.

¶ 83 Although the LEADS images must be suppressed in any retrial, they were sufficient, together with the other evidence adduced at the stipulated bench trial, to sustain the defendant's convictions for official misconduct. This would normally lead us to reverse and remand. The defendant, however, argues that this court should reverse the defendant's convictions outright. Several appellate cases adopt the position that if the State cannot prevail on retrial without the suppressed evidence, the appropriate remedy is outright reversal. See *People v. Harris*, 2015 IL App (1st) 132162, ¶ 47 (collecting cases). In these cases, the evidence of the crime itself was suppressed. Outright suppression was therefore appropriate, where without evidence of the commission of a crime, the prosecution could not proceed. *People v. Lara*, 2012 IL 112370, ¶ 17

(in criminal proceedings, the State must prove beyond a reasonable doubt that a crime was committed, the *corpus delicti*, and the identity of the person who committed the crime).

¶ 84 Here, Lieutenant McCullough, in a second search, found LEADS images that he suspected may have been accessed for personal, and not professional, reasons. The elements of official misconduct as charged here include that a public officer, acting in his official capacity, with the intent to obtain a personal advantage for himself, performs an act in excess of his lawful authority. 720 ILCS 5/33-3(a)(3) (West 2018).

¶ 85 The State could prove, absent the LEADS images, the defendant's status as a public officer and his intent without the LEADS images found on his phone. The State could not, however, prove based upon the evidence adduced at the stipulated bench trial alone, that the defendant performed the act of searching the LEADS database for the information of the individuals named in the images without the LEADS images. That said, we do not believe that outright reversal is appropriate in this matter. As opposed to a gun possession case, for example, where evidence of a specific gun could not be proven after suppression of that gun; here, evidence of the defendant's searches could have been found by other means.

¶ 86 Agent Border found evidence during his initial search of ARMS images purporting to depict a similar scheme to illegally access individuals' personal information for other than professional reasons, albeit within a different police database. The trial court found that those images were discovered by Agent Border in plain view during his initial search of the defendant's cellphone data. It is unclear based on the record of the stipulated bench trial, if there was any other evidence, such as search history records internal to the LEADS database, that would have shown the defendant's performance of the illegal LEADS searches for which he was convicted. While we

29

offer no opinion as to whether any potential alternative evidence would be admissible, the State should have the opportunity to prove the allegations by alternative means, if possible, on remand.

¶ 87                                       III. CONCLUSION

¶ 88    For the reasons stated herein, we find that the trial court erred in denying the defendant's motion to suppress evidence. Neither the good faith or inevitable discovery exceptions apply, and the error was not harmless. The error requires reversal of the suppression ruling of the trial court of Champaign County, and remand for a new trial. On remand, any evidence collected as a result of the illegal search shall be suppressed at retrial.

¶ 89    Reversed and remanded.